E. F. SMITH, administrator of estate of CLIFTON SMITH, appellant, v. NORLAN MILLER et al., appellees.

No. 47530.

(Reported in 40 N.W. 2d 597)

JANUARY 10, 1950.

REHEARING DENIED MARCH 10, 1950.

Stuart & Stuart, of Chariton, for appellant.

E. K. Jones and F. R. Curry, both of Osceola, and Bradshaw, Fowler, Proctor & Fairgrave, of Des Moines, for appellees.

MULRONEY, J.—The county jail in Osceola is located on the corner of the square in the business section of the town. It is a one-story building about 20 by 24 feet, constructed of cement with iron doors and iron bars on the outside of the windows. The windows are a little over six feet from the floor but they can be raised from the inside, and beneath at least some of the windows there are bunks. The building is approximately two feet from the sidewalk with an eight-foot iron fence between the jail and the sidewalk. The jail is equipped with bunks and cells and a "cage." With respect to the conduct of the jail the deputy sheriff testified: "Except for taking the meals there and taking the dishes out there was no regular time of checking prisoners except when we put someone in or take somebody out. * * * There was no method by which the prisoners might communicate with the outside, except by yelling or screaming."

Clifton Smith was the sole prisoner in this jail on Monday, February 9, 1948. He had been placed in a cell in the southwest corner but none of the cells was locked so he had the run of the jail. There were two mattresses on Clifton's bunk, two on another bunk, and additional mattresses piled in the corner of this southwest room by the chimney. Clifton's father called at the sheriff's office to visit him and he accompanied the deputy sheriff to the jail while the deputy brought Clifton his evening meal. There was some talk between Clifton and his father about getting Clifton out of jail on a bond and some talk about getting some medicine for Clifton. The deputy sheriff testified: "Clifton said he hadn't been able to sleep and he asked his father if it was possible to get some medicine for him. His father turned to me and said, 'It is so near chore time and I am late. Would you mind getting it for him?'. and I said, 'No, where do you get the medicine?', or, 'Where do you doctor?' He said, 'Doctor Boden, he knows what he needs. Just have him put it on the bill.'" The father testified: "On the evening when I visited my son in jail I did not request the deputy sheriff to get some medicine for my son. I asked him if he wouldn't talk to the doctor.

I told him, 'You have got a sick man over there and not a drunk man'. That's the way I remember it." At any rate, the deputy sheriff reached Dr. Boden about eight o'clock that evening and the doctor gave him a box of vitamin tablets and a box of tuinal (sleeping) capsules and directions to give Clifton the box of vitamin tablets, but only one tuinal capsule a day. The deputy returned to the jail and gave Clifton the box of vitamin tablets and one tuinal capsule. Clifton thanked the deputy and expressed his regret that he had been such a bother.

When the deputy returned to the jail with Clifton's breakfast about 8:15 on the morning of February 10 the jail was full of smoke from burning mattresses and Clifton was lying dead on the floor partly in the cell and partly in the corridor. It was established he died of suffocation, and his father as personal representative of his estate sued the sheriff and his bondsman, alleging Clifton's death was caused solely by the sheriff's negligence. At the close of plaintiff's testimony the trial court directed the verdict for the defendants on the ground the evidence was insufficient to prove the specific acts of negligence alleged.

I.   We can rule out all question of suicide. Not only is there a presumption against it but here there was no evidence tending to establish that Clifton sought that end to his troubles. He was about twenty-eight years old with a wife and two children. A man who had been in jail with him for the three days prior to his death said he was normal and "seemed to be all right" when he left the jail on Monday afternoon. There was some evidence that he had made an effort to save himself. There was water in the basin in one of the north cells (the basin in the southwest cell where Clifton slept did not work) and the deputy testified Clifton's face "looked like he put a wash cloth on it." The deputy also said a smoldering mattress had been kicked down the basement stairs. The record is silent as to whether there were any fire extinguishers in the jail or any pails or containers for water to use in the event of fire.

II.   About all that can be said as to the cause of the fire is that it was of unknown origin. Both sides theorize that Clifton fell asleep with a lighted cigarette that ignited the mattress. Maybe he did. The evidence would not indicate it started from the furnace for there was little smoke in the basement. When

the jail was entered on February 10 all of the mattresses in the southwest room were either burned up or burning.

III. Section 356.2, Code, 1946, provides that the sheriff "shall have charge and custody of the prisoners in the jail * * * and keep them until discharged by law." The sheriff's bond is conditioned that he will faithfully discharge all the duties of his office. Section 64.2, Code, 1946. Aside from statutory requirements a sheriff owes a general duty to a prisoner to save him from harm and he is personally liable for negligence or wrongful acts causing the prisoner's injury or death. 47 Am. Jur., Sheriffs, Police, and Constables, section 42; 57 C. J., Sheriffs and Constables, section 512; O'Dell v. Goodsell, 149 Neb. 261, 265, 30 N.W.2d 906, 909. In the last cited case it was held:

"Beyond statutory requirements a sheriff is bound to exercise in the control and management of the jail the degree of care requisite to the reasonably adequate protection of the prisoners or inmates. Ratliff v. Stanley, 224 Ky. 819, 7 S.W.2d 230, 61 A. L. R. 566; 57 C. J., Sheriffs and Constables, §512, p. 899; Kusah v. McCorkle, 100 Wash. 318, 170 P. 1023, L. R. A. 1918C, 1158; Eberhart v. Murphy, 110 Wash. 158, 188 P. 17, on rehearing, 113 Wash. 449, 194 P. 415; State of Indiana [ex rel. Tyler] v. Gobin, 94 F. 48."

In State of Indiana ex rel. Tyler v. Gobin, 94 F. 48, 50, a case where the sheriff was sued for failure to protect a prisoner against a mob which entered the jail, removed the prisoner and killed him, the court in speaking of the care which a jailer must exercise toward prisoners in his custody stated:

"* * * as the lawful custodian of the deceased, he [sheriff] owed to him the duty of exercising ordinary and reasonable care for his life and health. This duty was due to the deceased personally, and is additional to the duty of safe-keeping which he owes to the public. This duty of care arose from his having the person of the deceased committed to his custody by virtue of his office. * * * If the law imposes a duty of care in respect of animals and goods which he [sheriff] has taken into his possession by virtue of his office, why should not the law impose the duty of care upon him in respect of human beings who are in his custody by virtue of his office? Is a helpless prisoner in the custody of a sheriff less entitled to his care than a bale of goods

or a dumb beast? The law is not subject to any such reproach. When a sheriff, by virtue of his office, has arrested and imprisoned a human being, he is bound to exercise ordinary and reasonable care, under the circumstances of each particular case, for the preservation of his life and health."

IV. The real question here is whether the trial court was justified in ruling the sheriff was not negligent in the manner charged in the petition, as a matter of law, under the circumstances disclosed by plaintiff's testimony. Some of the specifications of negligence alleged here against the sheriff were: "2. In failing to properly guard and watch over a prisoner in his care and custody to whom his deputy sheriff had delivered a drug that produces drowsiness * * *. 3. In failing to provide means of communication for the prisoner in his care and custody in case of an emergency. 5. In failing to have a key or means of entrance to the jail in the possession of someone near by who might enter in the event of an emergency. 6. In failing to provide for a reasonable check on the prisoners confined in the jail under the existing conditions. 7. Failing to provide proper ventilation for the jail."

The specifications when read separately are none too clear. When read together they probably mean to predicate negligence by charging that the sheriff failed to provide Clifton with adequate fire protection under the circumstances then existing, and fire protection includes some adequate means or manner of exit or evacuation in a fire emergency. We can say here as we said in Arnold v. Fort Dodge, D. M. & So. R. Co., 186 Iowa 538, 544, 173 N.W. 252, 254: "* * * it is not quite accurate to say that the specifications of the petition herein can be deemed as separate or independent negligences."

We have found no case where, under similar facts, it was held the question was not for the jury to decide. The defendants cite Baker v. Walston, Tex. Civ. App., 141 S.W.2d 409, a case where the prisoner perished in a fire caused by a burning mattress, but the case is not in point for there it appears the case was submitted to the jury and the jury returned a verdict for the sheriff, and the appellate court, finding no error, affirmed.

The plaintiff cites O'Dell v. Goodsell, 149 Neb. 261, 265. 30 N.W.2d 906, 909, a case "on all fours" with the instant case,

where the prisoner was suffocated in the jail by a burning mattress, and the Supreme Court of Nebraska held it error for the trial court to direct the verdict for the sheriff. In the course of the opinion the court stated:

"We think it was error for the trial court to refuse to submit to a jury the failure of the sheriff to provide a guard for the jail in its described condition and the proper inferences to be drawn from such failure. We also think it was error for the court to refuse to submit to a jury the question of the adequacy of ventilation under the circumstances and the failure to make outside communication available and the proper inferences to be drawn from these circumstances.

"We think that the question of whether or not the sheriff under the circumstances failed to respond to his duty to the plaintiff's decedent, in the light of the potential for danger of which he knew or in the ordinary exercise of his faculties for observation and understanding should have known, was a question for determination by a jury."

In Clark v. Kelly, 101 W. Va. 650, 661, 133 S.E. 365, 369, 46 A. L. R. 799, a case where a prisoner sued the sheriff for damages for injury when the jail was flooded, the court stated:

"We will not undertake to review all the decisions cited by counsel for the proposition many times affirmed, that a public officer is liable to anyone injured by the nonperformance or negligent performance of his ministerial duties, and this without regard to his motives and without reference to any question of corruption; and whether he has discharged these imposed duties is generally a question of fact for the jury."

Another case somewhat in point, where the prisoner was injured in seeking escape from a burning jail, is Allen v. Cavin, 179 Okla. 460, 461, 66 P.2d 40, 42. There the court stated:

"It may be seen, therefore, that the weight of authority is that the statutory duty imposed upon the sheriff to keep his prisoners safely charges him with the duty of ordinary care to accord them decent treatment and to see that they do not come to harm by negligence. We are, therefore, of the opinion that

this matter should have been submitted to the jury under the facts in this case."

The courts all speak of the sheriff's duty toward his prisoner in jail, as reasonable care under the circumstances. But the very confinement in a locked building is a circumstance, in that it prevents inmates to escape from fire in the building. In Restatement of the Law, Torts, section 320b, comment is made with regard to the care a sheriff should exercise to protect a prisoner from assaults of third persons, and it is there stated: "The very fact of imprisonment prevents a prisoner from avoiding attacks by flight."

The same comment could be made about a prisoner exposed to the hazard of injury by fire but deprived of normal power of self-protection, namely, flight. The argument is made that the jail was fireproof. It probably was in the sense that the structure was incombustible. But as to a fire of combustible material and equipment in the jail, such as blankets, mattresses, magazines and the like, a jury might hold it was a firetrap. The nearest key to the jail at night was at the deputy's residence, nine blocks from the jail.

We think it was error for the trial court to direct the verdict for the defendants; that the question of negligence under the record was for the jury.

V. The defendants argue the direction of the verdict can be sustained on the ground the evidence established, as a matter of law, that deceased was guilty of contributory negligence. No cases are cited as authority for such a conclusion. There is no merit in the contention. There were no witnesses to the tragedy which took place in the jail. The plaintiff is entitled to the presumption that deceased exercised due care for his own safety. Graham v. City of Ames, 196 Iowa 337, 192 N.W. 299.

For the reasons stated the cause is reversed.—Reversed.

BLISS, C.J., and OLIVER, GARFIELD and WENNERSTRUM, JJ., concur.

HAYS, HALE, SMITH, and MANTZ, JJ., dissent.

HAYS, J. (dissenting)—I respectfully dissent.

While the facts in this case are rather peculiar and present

a situation which seldom occurs, as evidenced by the absence of similar situations appearing in the reported cases, it is simply an action for damages arising out of the alleged negligence of the defendant Miller, sheriff, in the performance of an administrative duty. It concerns the duty that an officer owes to a prisoner confined in a jail over which the officer has the control and management. In some instances that duty is statutory, but under the specifications of negligence set forth in plaintiff's petition no statutory violation is charged and the case must rest upon the common-law rules of negligence. By these rules the duty owed is that of ordinary care under the circumstances. Whether or not a person so acts is to be determined upon the facts as they appeared at the time, and not by a judgment from the actual consequences which were not then to be apprehended by a prudent or ordinary person. The Germanic, 196 U. S. 589, 25 S. Ct. 317, 49 L. Ed. 610. Negligence, to be actionable, must be tested by the reasonable foreseeability of an event which may have resulted in injury and exists where there is a failure to guard against a reasonably to be expected danger. Thyssen v. Davenport Ice & Cold Storage Co., 134 Iowa 749, 112 N.W. 177, 13 L. R. A., N. S., 572; Saylor v. Parsons, 122 Iowa 679, 98 N.W. 500, 64 L. R. A. 542, 101 Am. St. Rep. 283; State, to the use of Henderson v. Clark, 41 Del. 246, 20 A.2d 127, 138 A. L. R. 704; Riggs v. German, 81 Wash. 128, 142 P. 479; Lamb v. Clark, 282 Ky. 167, 138 S.W.2d 350; Restatement of the Law, Torts, Negligence, section 320, comment d.

With these general pronouncements in mind, an examination of the record in the instant case convinces me that the injury was so unforeseeable that reasonable minds could not differ thereon, in which case it was the duty of the trial court to direct a verdict.

The material facts are stated in the majority opinion and need not be repeated, but, briefly, the record shows that the jail was located upon the public square. It was of steel and concrete construction and contained several windows which could be opened from the inside, allowing both fresh air and communication with the outside. No combustible materials appear to have been about and the furnace and flue were functioning properly. But one person, Clifton Smith, the deceased, was confined therein

and he had the freedom of the entire jail. Other than the announced inability to sleep, nothing appears to have been wrong with decedent. This jail, in common with many jails in the rural counties of this state, was not equipped with living quarters for an attendant nor with offices for the officers. It was the custom here, as in many other county jails thus equipped, for the officials to take the meals for the prisoners at the usual time and to be at the jail only at such other times as their duties might require. While custom cannot negative a duty and relieve from negligence, it may and should be considered in determining what is due care under the circumstances. The fire which caused the death of decedent by suffocation consisted of burning blankets and mattresses. How the fire started the record does not show, but it is clear that it did not start from the furnace.

Six specific acts of negligence are set forth in the petition:

(1) Failing to supervise the administration of sedatives to a prisoner.—At the request, or at least with the knowledge, of the decedent a sedative (tuinal) was obtained for him from his own physician and was given to him in strict accordance with the instructions of the physician. It appears to be a mild sedative, and decedent was accustomed to using the same. If the sedative was of a nature that would require observation of a person taking the same, the deputy sheriff, who obtained it and gave it to decedent, was not so advised by the physician.

(2) Failing to watch over the prisoner after giving him a sedative that produced drowsiness.—Admittedly, the sedative was to enable decedent to get some sleep, but there is certainly nothing in this record that would reasonably indicate to the officers any reason for placing a guard over him after the taking of the one capsule, as directed by the physician.

(3) Failing to provide means of communication in case of an emergency.—Under the statutes of this state, the duty of providing and equipping the jail is lodged in the supervisors. The sheriff takes it as it is. The only purpose of a telephone or other type of communication with the outside would be for the summoning of aid. The record shows that the windows were capable of being opened by anyone on the inside, which would allow an alarm to be spread. In fact, at the time that decedent was given his evening meal on the evening before his death he

was talking with a party outside the jail through an open window. Assuming that decedent's condition from the smoke of the fire was such that he could not raise the window, it is pure speculation to say that he might have reached a phone.

(4) Failing to have a key in the possession of someone near by who might enter in case of an emergency.—Under the record, no one knew or could have known of the existence of the fire without going into the jail. When the officer went to the jail with the morning meal, it was not until he had entered the jail and opened the inner steel door that he found the place full of smoke. There was no outward evidence thereof and no basis for assuming that anyone having a key thereto would have felt any need for using the same.

(5) Failing to provide a reasonable check of prisoners confined in the jail.—Again, the jail was not equipped with office or living quarters nor was the sheriff furnished with a jailer, who would constantly be in attendance at the jail. We are concerned only with the conduct of the defendant at the time in question and in view of the situation as it then appeared: One prisoner, apparently in good health, although somewhat nervous; a reasonably fireproof jail located in the very heart of the city, and no unusual condition existing are the conditions confronting the sheriff. I am unable to see how any average, prudent person could, under these facts, foresee any possible reason for a watch over the prisoner or for more periodical visits to the jail than the record shows were made.

(6) Failing to provide proper ventilation for the jail.—As before stated, there were numerous windows capable of being raised by one inside the jail, which fact was known to decedent who had the freedom thereof. This provided ample means for ventilation, and to assume that any other type or means of ventilation would have been of any benefit to decedent is pure speculation. Certainly no duty rested on the sheriff to provide more.

Under this record, taking the specifications of negligence singly, or together as a general charge of failing to provide protection to a prisoner and as apparently has been done in the majority opinion, I am unable to see wherein plaintiff has made even a prima facie case. As stated in Saylor v. Parsons, 122

Iowa 679, 98 N.W. 500, 64 L. R. A. 542, 101 Am. St. Rep. 283, the natural and probable consequences are those which. human foresight can anticipate because they happen so frequently that they may be expected to happen again, and the possible consequences are those which happen so infrequently that they are not expected to happen again. If men were to be held answerable for everything they did or did not do which was dangerous in fact they would be held for all their acts from which harm in fact ensued. This, in my judgment, is the effect of the majority opinion.

I would affirm the trial court.

HALE, SMITH, and MANTZ, JJ., join in this dissent.