Nicholas J. LLOYD, Appellant,

v.

DRAKE UNIVERSITY, the Institution in all Capacities, and David Maxwell, in His Official and Individual Capacity, Appellees.

No. 03–1105.

Supreme Court of Iowa.

Sept. 1, 2004.

Donna M. Schauer, Des Moines, for appellant.

Michael R. Reck, James R. Swanger, and Margaret C. Callahan of Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, for appellees.

STREIT, Justice.

A Drake University security guard tried to forcibly subdue a black football player at a university-sponsored street-painting event. The security guard thought the football player was assaulting a female student. The security guard's actions, which were caught on videotape, ignited a media firestorm and inflamed racial passions. He was eventually fired.

The security guard sued for wrongful discharge, defamation, and fraudulent misrepresentation. His wrongful-discharge claim was premised upon the theory that, notwithstanding our long tradition of at-will employment, it is wrong as a matter of public policy for an employer to fire a security guard simply for upholding the criminal laws of the state. Because we find the security guard's claims lack merit, we affirm the district court's dismissal of his lawsuit in its entirety.

## I. Facts and Prior Proceedings

Viewed in a light most favorable to the plaintiff, Nicholas Lloyd, the facts are as follows:

Nicholas Lloyd was a Drake University security guard on duty at the annual Drake Relays street-painting event on April 20, 2002. A student told Lloyd about an apparent altercation between Phillipe Joseph, a Drake football player, and Erin Kane. Lloyd and Kane were white; Joseph was black. Joseph was holding Kane in the air with her feet kicking. Lloyd and another security guard, Steven Smith, thought Joseph was holding Kane in a headlock. Although Kane later claimed she and Joseph were just friends engaged in horseplay, Lloyd alleges Joseph's girlfriend called Lloyd and said Joseph had admitted to her that he and Kane were fighting.

Lloyd ordered Joseph to release Kane. After Lloyd's second command, Joseph did so. Joseph suddenly made a 180-degree turn and lunged toward Lloyd with his fists raised to his chest and "an angry look on his face." Lloyd feared for his own safety and pepper sprayed Joseph. Smith reached for his pepper spray at the same time and would have sprayed Joseph if Lloyd had not done so first.

Another Drake security guard, Sergeant Risvold, attempted to handcuff Joseph, but was unable to do so—Joseph was still writhing from the pepper spray. Lloyd hit Joseph on the thigh with his baton, forcing him to the ground.

Des Moines police officers took Joseph to the police station, where he was charged with disorderly conduct. Meanwhile, witnesses began screaming "racist, racist" at Lloyd. Students immediately discussed the incident with Drake's president, David Maxwell. Maxwell obtained Joseph's release and took him for medical treatment, even though he had not previously complained about any injuries resulting from the arrest. Joseph later pled guilty to disturbing the peace. He also received a settlement from Drake.

As local media reported on the street-painting episode, Lloyd's actions became the subject of a heated controversy. After the NAACP and Black Student Coalition demanded an investigation, Drake organized a panel to study the incident and related topics.

The panel concluded Lloyd had overreacted and used unnecessary force. Although the panel determined Lloyd's actions at the street-painting event were not overtly racially motivated, the panel discovered some prior complaints against Lloyd involving minority students. (Lloyd, however, points out he was never reprimanded on any of those occasions.) The panel also criticized Drake for insufficiently training its security guards and its "ambiguous philosophy for security."

During the investigation, Drake assigned Lloyd to a desk job. Maxwell assured Lloyd he would not lose his job. One of Lloyd's supervisors told Lloyd he was still in line for a promotion.

Nonetheless, Drake fired Lloyd from his security position on June 16, 2002. It offered him a transfer to openings elsewhere, but the only one he qualified for was a custodial position. Drake kept Lloyd on the payroll for three months, but Lloyd refused to accept a transfer.

Lloyd sued Drake and Maxwell for wrongful discharge, defamation, and fraudulent misrepresentation. Lloyd's wrongful-discharge claim was premised upon the theory he was fired in violation of public policy: Lloyd argues he was fired simply for enforcing the criminal laws of the state. The district court granted the defendants'

motion for summary judgment on all three claims. Lloyd appealed.

Additional facts will be set forth below as needed.

## II. Standard of Review

Summary judgment is improper unless the record shows no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3); *see, e.g., Coralville Hotel Assocs., L.C. v. City of Coralville,* 684 N.W.2d 245, 247 (Iowa 2004). When examining the record, the court views it in a light most favorable to the nonmoving party. *Coralville Hotel Assocs.,* 684 N.W.2d at 247. We will "indulge in every legitimate inference that the evidence will bear in an effort to ascertain the existence of a fact question." *Id.* at 247–48 (quoting *Crippen v. City of Cedar Rapids,* 618 N.W.2d 562, 565 (Iowa 2000)). Whether a public policy against discharge exists is a question of law appropriately decided on a motion for summary judgment. *See Fitzgerald v. Salsbury Chem., Inc.,* 613 N.W.2d 275, 282 (Iowa 2000).

## III. Merits

### A. Wrongful Discharge

Lloyd does not dispute he was an at-will employee. As a consequence, Drake could fire him for any lawful reason or for no reason at all. *Theisen v. Covenant Med. Ctr., Inc.,* 636 N.W.2d 74, 82 (Iowa 2001); *cf. Harrod v. Wineman,* 146 Iowa 718, 720, 125 N.W. 812, 813 (1910) (stating traditional rule that "indefinite employment may be abandoned at will by either party without incurring any liability"). A discharge is not lawful, however, when it violates public policy. *See Fitzgerald,* 613 N.W.2d at 281. Lloyd claims Drake violated public policy and thereby committed the tort of wrongful discharge when it fired him simply for upholding the criminal laws, i.e., attempting to arrest Joseph, a man he thought was assaulting a student.

Having alleged a violation of public policy, to succeed in his wrongful-discharge claim Lloyd must thus prove:

(1) The existence of a clearly defined public policy that protects an activity.

(2) This policy would be undermined by a discharge from employment.

(3) The challenged discharge was the result of participating in the protected activity.

(4) There was lack of other justification for the termination.

*Davis v. Horton,* 661 N.W.2d 533, 535 (Iowa 2003) (citing *Fitzgerald,* 613 N.W.2d at 282 n. 2); *accord Teachout v. Forest City Cmty. Sch. Dist.,* 584 N.W.2d 296, 299 (Iowa 1998) (identifying the elements of a wrongful-discharge claim rooted in a violation of public policy as (1) engagement in a protected activity; (2) discharge; and (3) a causal connection between the conduct and the discharge). The district court dismissed Lloyd's wrongful-discharge claim on causation grounds, ruling Drake had fired Lloyd for a variety of other lawful reasons, including (1) a desire to capitulate to outside pressures in the hope of forestalling a lack of public confidence in Drake's security system and (2) a determination—based upon newly rediscovered prior complaints and the panel's conclusion Lloyd used premature and excessive force in subduing Joseph—that Lloyd lacked the appropriate demeanor of a security guard. (On appeal, Drake also points out Lloyd's conduct affected its relationships with a variety of constituencies, and his retention could have cost it essential financial support.) The district court did not expressly decide whether public policy prevented an employer from firing a private security

guard simply for upholding the criminal law.

We take a different route than the district court, but reach the same conclusion. We decline to decide whether Lloyd has generated a genuine issue of material fact on the causation element of his claim. The record made on this issue is murky and conflicted, and in the wrongful discharge context "the elements of causation and motive are factual in nature and generally more suitable for resolution by the finder of fact." *Fitzgerald,* 613 N.W.2d at 282. On the other hand, whether a public policy exists against discharge presents a question of law for the court to resolve. *Id.* Because our rules of error preservation permit us to affirm the district court ruling on any ground urged in the trial court, in this opinion we only address the question of whether there is a public policy against discharge for upholding the criminal laws of the state. *See DeVoss v. State,* 648 N.W.2d 56, 62 (Iowa 2002) (setting forth basic error preservation principles). Even assuming Lloyd was fired simply for upholding the law, we think his claim still fails because the public policy against discharge that Lloyd asserts is neither clearly defined nor well recognized.

As indicated, in order to prevail on his wrongful-discharge claim Lloyd must first identify a clearly defined and well recognized public policy that would be undermined by his dismissal. *See Fitzgerald,* 613 N.W.2d at 282. To determine whether such a public policy exists, on prior occasions we have generally looked only to our statutes and state constitution. *See id.* at 283. We have also recognized that other states have looked to other sources, such as judicial decisions and administrative rules. *See id.* Regardless of the source, however, "we proceed cautiously *and will only extend such recognition to those policies that are well recognized and clearly defined." Davis,* 661 N.W.2d at 536 (emphasis added). Only such policies are weighty enough "to overcome the employer's interest in operating its business in the manner it sees fit," which we have long and vigorously protected. *Fitzgerald,* 613 N.W.2d at 282.

Over the years we have recognized a number of clearly defined public policies. *See, e.g., id.* at 285–89 (public policy in favor of providing truthful testimony); *Teachout,* 584 N.W.2d at 300–01 (public policy in favor of reporting suspected child abuse); *Tullis v. Merrill,* 584 N.W.2d 236, 239 (Iowa 1998) (public policy in favor of permitting employees to make demand for wages); *Lara v. Thomas,* 512 N.W.2d 777, 782 (Iowa 1994) (public policy in favor of permitting employees to seek partial unemployment benefits); *Springer,* 429 N.W.2d at 560–61 (public policy in favor of permitting employees to seek workers' compensation for work-related injuries). To date, however, we have not held that a private security guard's actions in "enforcing the criminal laws of the state" to be a well recognized and clearly defined public policy.

Not surprisingly, Lloyd cites little authority, and his argument mostly consists of vague generalizations about the social desirability of upholding the criminal laws of the state. He draws upon our language in *Borschel v. City of Perry,* 512 N.W.2d 565 (1994), in which we remarked that other

> [c]ourts have recognized a cause of action for discharge in violation of public policy when the termination of the employee "is *in retaliation for performing an important and socially desirable act,* exercising a statutory right, or refusing to commit an unlawful act."

512 N.W.2d 565, 567 (Iowa 1994) (quoting 82 Am.Jur.2d *Wrongful Discharge* § 14, at 687 (1992) (emphasis added)). Lloyd also

points out that there need not be an express statutory prohibition against discharge to underpin the public policy. *See id.* at 568. In a number of cases, we have "found an implied prohibition against retaliatory discharge based on an employee's exercise of a right conferred by a clearly articulated legislative enactment." *Id.* The gist of Lloyd's argument is that because upholding the criminal laws is important and socially desirable conduct, this court should find a public-policy exception to the at-will employment doctrine for a private security guard who tried to effectuate an arrest of a suspected criminal.

Lloyd's argument is not well taken. We have little quarrel, however, with one of the basic premises of Lloyd's argument: namely, that the criminal laws of the state reflect a general public policy against crime and in favor of the protection of the public. That said, the public policy asserted here is far too generalized to support an argument for an exception to the at-will doctrine. In short, the public policy is not *clearly defined.* Apart from a vague reference to the whole of the criminal law, Lloyd cites no statutory or constitutional provision to buttress his claim. Divorced from any such provision or equivalent expression of public policy, we cannot find a well recognized and clearly defined public policy in such vague generalizations. "Any effort to evaluate the public policy exception with generalized concepts of fairness and justice will result in an elimination of the at-will doctrine itself." *Fitzgerald,* 613 N.W.2d at 283 (citation omitted). "[I]t could unwittingly transform the public policy exception into a 'good faith and fair dealing' exception, a standard we have repeatedly rejected." *Id.*

Lloyd's best attempt at grounding his claim in a specific legal principle involves citation to a recent federal district court ruling, which references the fact that we have on prior occasions recognized a "special relationship" between peace officers and the members of the public they protect. *Cf. Freeman v. Busch,* 150 F.Supp.2d 995, 1000 (S.D.Iowa 2001). The line of cases Lloyd refers to, however, is clearly distinguishable; these cases do not create an all-encompassing duty that would require *private* security guards to investigate crime and make arrests whenever they have probable cause to do so. We have only recognized that peace officers owe a special duty to aid and protect those who are *in their custody. See, e.g., Hildenbrand v. Cox,* 369 N.W.2d 411, 415 (Iowa 1985) ("The Restatement and case law also recognize that persons who take others into their custody, for example peace officers who arrest persons suspected of crime, owe a special duty to aid and protect them.") (citing, in part, Restatement (Second) of Torts § 314A(4) (1965)); *Smith v. Miller,* 241 Iowa 625, 628–31, 40 N.W.2d 597, 598–600 (1950); *see also Tinius v. Carroll County Sheriff Dep't,* 321 F.Supp.2d 1064, 1085 (N.D.Iowa 2004) ("Iowa courts have determined that law enforcement officers have a duty of care to protect detainees from personal harm.").

In sum, we find no cited authority to suggest a *clearly defined* public policy. *See Fitzgerald,* 613 N.W.2d at 283 ("The need for clarity in public policy is similarly recognized in our reluctance to search too far beyond our legislative pronouncements and constitution to find public policy to support an action."). Nor is it well recognized. Having found no support in our own precedents or other legal authority in this jurisdiction, we note that two other courts have rejected similar arguments. For example, the Oregon Supreme Court wrote:

> [S]uch expressions of a public desire for law and order are far too general. . . . We are concerned here with a duty to perform a specific act (the arrest of

lawbreakers by private citizens or private security personnel), and the statutes cited have nothing to say about that kind of act.... [The statutes] are neutral on the essential issue, which is whether the law encourages law enforcement action by private individuals or security personnel or otherwise demonstrates that such acts enjoy high social value.

*Babick v. Oregon Arena Corp.*, 333 Or. 401, 40 P.3d 1059, 1063 (2002). Likewise, the Maryland Court of Special Appeals, in ruling against a store security guard who was fired for investigating whether his store manager was a thief, ruled the criminal statute the employee was upholding "makes theft a crime, but does not impose on citizens a duty to investigate or report theft." *Sears, Roebuck & Co. v. Wholey*, 139 Md.App. 642, 779 A.2d 408, 417 (2001), *aff'd*, 370 Md. 38, 803 A.2d 482 (2002). Unlike *Fitzgerald*, in which we held the law against perjury necessarily implies an inverse corresponding public policy to provide truthful testimony, here the inverse of the policy that the criminal laws ought not be broken is clearly *not* that everyone who sees a crime committed must actively try to stop it. 613 N.W.2d at 286. In the absence of any statutory, constitutional, or other expression imposing a duty upon private security personnel to do so, we can find no origin for the well recognized and clearly defined public policy essential to carve out an exception to the at-will employment doctrine. There is nothing, then, to sustain the tort of wrongful discharge on these facts—however encouraged or frequently beneficial it may be to have private citizens take it upon themselves to enforce the criminal laws. *Cf. Davis*, 661 N.W.2d at 536 ("[W]e are satisfied that the

mediation of disputes, although encouraged and frequently beneficial, is not an activity so imbued with public purpose as to satisfy the clarity element that our cases require."). The point is simply this: while we might be persuaded that society would be better off if private security personnel investigated and attempted to stop crimes in progress, we are not convinced it is a clear and well recognized public policy of this state "that we all become citizen crime fighters." *See Wholey*, 779 A.2d at 416 (internal quotation omitted).

## B. Defamation

In both the district court and now on appeal, Lloyd has primarily focused his energies upon his wrongful-discharge claim.[1] In the district court, however, Lloyd also claimed Drake and Maxwell defamed him, and as a consequence he has been unable to find employment in security and related law-enforcement fields. The district court dismissed Lloyd's claim on procedural grounds, but also held that Lloyd had failed to show how the statements he attributed to Drake and Maxwell were capable of a defamatory understanding.

As a matter of procedure, the district court dismissed Lloyd's claim because he failed to state in his petition with sufficient specificity which particular statements of the defendants were defamatory. The district court relied, in part, upon the common-law pleading rule as adopted in *Nelson v. Melvin*, which required that a plaintiff's petition in a defamation action set forth the defamatory words relied upon with particularity. 236 Iowa 604, 609–11, 19 N.W.2d 685, 688–89 (1945); *cf. Vantassell–Matin v. Nelson*, 741 F.Supp. 698, 707–08 (N.D.Ill.1990). Notwithstand-

---

1. For example, Lloyd's counsel only sought to address the wrongful-discharge claim at oral argument.

ing the fact that we have long since adopted notice pleading in this state, on appeal Lloyd does not challenge the continuing validity of the common-law rule. Lloyd simply claims the entire panel report was defamatory, insofar as it (1) suggested he was immoral and a racist and (2) contained false and "disparaging psycho-social remarks" about him. For the latter argument Lloyd seizes upon statements in the panel's report that allege Lloyd "overreacted," had a "confrontational mindset," and "was too quick to use force" at the street-painting event. Lloyd vigorously denies he is a racist, and the record contains affidavits from a number of Des Moines police officers who contradict Drake's "damaging psycho-social remarks" about him.

■ We decline the defendants' invitation to likewise affirm dismissal of this case upon the old common-law pleading rule stated in *Nelson*. Rather, we simply hold that nothing in the panel report can reasonably be interpreted as suggesting Lloyd was a racist, and that Lloyd has failed to preserve error on much of the complaints asserted on appeal.

■■ We begin our analysis with the observation that "[i]t is for the court, in the first instance to determine whether the words are capable of a defamatory meaning, and for the jury to determine whether they were so understood." *Brown v. First Nat'l Bank of Mason City*, 193 N.W.2d 547, 553 (Iowa 1972) (citations omitted); *accord* Restatement (Second) of Torts § 614 (1977). The only two statements in the panel's report that the district court specifically addressed were:

(1) "The panel found no evidence of overt racial motivation in any aspect of the actions that led to the arrest of Phillipe Joseph."

and

(2) "The [p]anel concluded that, even assuming *arguendo* that Lloyd's actions may have been influenced in part by Phil Joseph's race, the predominant motive was Lloyd's confrontational-control mindset...."

Neither of these two statements can reasonably be interpreted as defamatory. In the first statement the panel *denied* Lloyd was racist; in the second, it explicitly *assumed* he was racist for the sake of argument. As for any other alleged defamatory remarks in the panel report concerning Lloyd's alleged racism, or even the "disparaging psycho-social remarks," the district court did not rule on their merits and Lloyd did not file a motion asking the district court to do so. *See* Iowa R. Civ. P. 1.904(2). We therefore will not consider these claims for the first time on appeal. *Meier v. Senecaut III*, 641 N.W.2d 532, 537 (Iowa 2002) ("When [the] district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal."); *accord Sorci v. Iowa Dist. Ct.*, 671 N.W.2d 482, 490–91 (Iowa 2003).

### C. Fraudulent Misrepresentation

■ Lloyd claims Maxwell committed fraudulent misrepresentation when he assured him Drake would "take care of him" and that Lloyd "did not have to worry about anything."[2] Maxwell admits he

---

**2.** On appeal, it appears Lloyd also claims *Drake* is liable for fraudulent misrepresentation because President Maxwell's wife brought him cookies and told him "everything's going to be all right," as well as because a supervisor told him he would be

promoted once matters "blew over." Once again, however, the district court did not rule on these claims for this purpose, and Lloyd did not file a motion urging the court to consider them. As a consequence, we will not entertain them for the first time on ap-

made the statements, but maintains he only intended to allay Lloyd's concerns about his potential civil liability to Joseph and not to make any representations about Lloyd's job security.

To succeed in his fraudulent-misrepresentation claim, Lloyd

must establish the following elements by a preponderance of clear, satisfactory, and convincing proof: (1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, (7) resulting injury and damage.

*City of McGregor v. Janett,* 546 N.W.2d 616, 619 (Iowa 1996) (citing *Cornell v. Wunschel,* 408 N.W.2d 369, 374 (Iowa 1987)). We have recognized the applicability of this doctrine in the employment context. *Lara,* 512 N.W.2d at 782–83. The district court ruled Lloyd could not prove representation, scienter, intent to deceive, or reliance, and dismissed his claim.

We agree with the district court that there is no evidence Maxwell intended to deceive, and thus his fraudulent-misrepresentation claim must fail. There is no evidence in the record from which a reasonable fact finder could conclude by a preponderance of clear, satisfactory, and convincing proof that Maxwell had any existing intent to deceive *when he made the representations in question.* Even if Maxwell had promised Lloyd he would keep his job, by the time Drake decided to terminate Lloyd much had transpired. Time passed, and the inquiry panel's investigation discovered, among other things, four other possible confrontations with minority students. As the defendants point out, there is insufficient evidence to prove, with clear, satisfactory, and convincing evidence, that Maxwell had already decided

to discharge Lloyd when he made the representations in question. Rather, the only evidence in the record tends to show Maxwell changed his mind due to changed circumstances, which hardly manifests the requisite intent to deceive. *Cf. Robinson v. Perpetual Servs. Corp.,* 412 N.W.2d 562, 566 (Iowa 1987) ("The mere breach of a promise is never enough in itself to establish the fraudulent intent. It may ... be inferred from the circumstances, such as the defendant's ... *repudiation of the promise soon after it was made, with no intervening change in the situation ....*") (emphasis in original, citation omitted); *Hagarty v. Dysart–Geneseo Cmty. Sch. Dist.,* 282 N.W.2d 92, 95–96 (Iowa 1979) ("Subsequent events changed the facts so that if the representation had been made later it would not then have been true. But this does not give viability to a claim based upon an earlier representation which was true when made and when relied on.").

## IV. Conclusion

We affirm the judgment of the district court. First, while it may be beneficial to have private citizens take it upon themselves to enforce the criminal laws, we cannot find a well recognized and clearly defined public policy essential to carve out an exception to the at-will employment doctrine and sustain the tort of wrongful discharge for simply "upholding the criminal laws." Second, Lloyd has waived much of his defamation claim, and those statements upon which he has preserved error cannot reasonably be understood as defamatory. Lastly, a reasonable fact finder could not conclude by a preponderance of clear, satisfactory, and convincing proof that Maxwell had any existing intent

peal. *Meier,* 641 N.W.2d at 537 ("When [the] district court fails to rule on an issue properly raised by a party, the party who raised the

issue must file a motion requesting a ruling in order to preserve error for appeal."); *accord Sorci,* 671 N.W.2d at 490–91.

to deceive when he made the representations in question.

**AFFIRMED.**