MANSFIELD, Justice
(concurring in part and dissenting in part).
I. Introduction.
The majority opinion significantly and, in my view, ill-advisedly broadens the scope of Iowa’s tort of wrongful discharge in violation of public policy. Under the majority opinion, any time a worker tells a coworker about an alleged violation of law related to health, safety, or welfare, the *310 employer is at risk of litigation if the employer subsequently terminates that worker’s employment. This decision is contrary to our precedents, which deferred to the other branches of government in defining the scope of the tort. Thus, our prior decisions required an express or implicit legislative or administrative determination to protect internal reporting. The present expansion of the law eliminates that requirement and thereby erodes Iowa’s longstanding doctrine of employment at will. For the reasons set forth herein, I would hold the plaintiff did not engage in protected activity under Iowa law, and therefore the defendant’s motion for directed verdict on liability should have been granted.[6]
Until today, our law was clear:
To prevail on an intentional tort claim of wrongful discharge from employment in violation of public policy, an at-will employee must establish the following elements: (1) the existence of a clearly defined and well-recognized public policy that protects the employee’s activity; (2) this public policy would be undermined by the employee’s discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason the employer discharged the employee; and (4) the employer had no overriding business justification for the discharge.
Berry v. Liberty Holdings, Inc., 803 N.W.2d 106, 109-10 (Iowa 2011). We had reiterated that standard many times. See Ballalatak v. All Iowa Agric. Ass’n, 781 N.W.2d 272, 275 (Iowa 2010); Jasper v. H. Nizam, Inc., 764 N.W.2d 751, 761 (Iowa 2009); George v. D.W. Zinser Co., 762 N.W.2d 865, 871 (Iowa 2009); Lloyd v. Drake Univ., 686 N.W.2d 225, 228 (Iowa 2004); Davis v. Horton, 661 N.W.2d 533, 535 (Iowa 2003); Fitzgerald v. Salsbury Chem., Inc., 613 N.W.2d 275, 282 n. 2 (Iowa 2000).
This test was not difficult to apply, which was one of its virtues. The tort required both “the existence of a clearly defined and well-recognized public policy that protects employee’s activity” and that “the employee engaged in the protected activity.” Berry, 803 N.W.2d at 109-10; accord Ballalatak, 781 N.W.2d at 275; Jasper, 764 N.W.2d at 761; George, 762 N.W.2d at 871; Lloyd, 686 N.W.2d at 228; Davis, 661 N.W.2d at 535; Fitzgerald, 613 N.W.2d at 282 n. 2. In other words, the employee had to have engaged in the activity that the statute or regulation protected. In the whistleblowing context, this meant the employee’s activity (i.e., reporting) had to be the subject of a clearly defined and well-recognized public policy, not merely that the employee reported on something that was the subject of such a policy. The clearly defined and well-recognized policy had to cover reporting itself.
Consistent with that law, we had allowed internal whistleblowing claims to go forward where an applicable statute or regulation expressly recognized internal reporting. See Tullis v. Merrill, 584 N.W.2d 236, 239-40 (Iowa 1998) (finding that an internal complaint about the withholding of wages was protected activity because the statute and regulations provided that “ ‘an employee would be protected against discharge or discrimination caused by the complaint to the employer’ ” (quoting Iowa Admin. Code r. 347 — 36.6(2))). And we *311 had disallowed such claims where the plaintiff could not point to any statute or regulation that covered internal reporting. See Ballalatak, 781 N.W.2d at 278 (finding no protection for “internal complaints based on a concern that the employer may not be complying with workers’ compensation laws”).
The majority now sweeps away that previously clear legal standard and replaces it with a series of platitudes about health, safety, and welfare. Thus, the majority eliminates any distinction between external reporting and internal reporting with the broad-brush statement, “[Wjhether the employee makes the complaint internally or externally does not change the public policy considerations of our state.” The majority also says, “We should not allow an employer to ignore the substance either of a statute or administrative regulation or the statement of public policy that it represents.” Quoting an out-of-state case, the majority adds, “ ‘There is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens.’” Palmateer v. Int’l Harvester Co., 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876, 879 (1981).
These are noble sentiments, but the upshot is: Whenever an employee speaks to a coemployee about a violation of some law or regulation that relates to health, safety, or welfare, the employer puts itself in legal jeopardy if it later discharges that employee. I recognize the employee still must prove the complaint was the reason for the discharge, but questions of causation are often disputed and difficult to prove or disprove. Thus, a business may be reluctant to replace one employee with another person, who it believes will do a better job, out of fear of litigation. This will be a new cost of doing business in Iowa.
We have been willing to accept that cost, and ought to continue to accept that cost, when the employee engaged in clearly defined and well-recognized protected activity. But there are myriad laws and regulations relating to “health, safety, and welfare.” There are also many types of violations, ranging from the serious to the trivial. This case falls somewhere in the middle. The nursing home’s employees acted deceitfully in falsifying training records, but there is no indication that the care received by any resident was affected. Also, employees participate in workplace discussions all the time. If we make the tort available whenever an employee brings an alleged health, safety, or welfare violation to the attention of a coemployee, we have truly changed the nature of that tort in Iowa.
Previously, we said on many occasions that the public-policy exception in Iowa is a “narrow” exception to employment at will. See, e.g., Berry, 803 N.W.2d at 109; Ballalatak, 781 N.W.2d at 275; Jasper, 764 N.W.2d at 762; Phipps v. IASD Health Servs. Corp., 558 N.W.2d 198, 202 (Iowa 1997); Lara v. Thomas, 512 N.W.2d 777, 781-82 (Iowa 1994). This is consistent with the basic policy in Iowa that employers who do not engage in discrimination and have not entered into collective bargaining or other express or implied contractual relationships with their employees should generally be free to hire and fire employees without fear of having those decisions second-guessed in court. The majority opinion, I respectfully submit, is inconsistent with this characterization.
II. The Plaintiff Only Engaged in Internal Reporting, Not External Reporting.
Oak Park Place is an unsympathetic defendant, and Karen Dorshkind is a sympathetic plaintiff. Still, I would like to high *312 light some points in the trial record.[7] Dorshkind never went to the Department of Inspections and Appeals (DIA) with her concerns, and the trial record indicates she didn’t want the state involved at all. Her “first concern was always the residents,” but she was also concerned “for the company ... what would happen.”
On July 24, 2008, during a site visit by the DIA, two employees of Oak Park, Tim Hendricks and Kristi Niemer, were apparently engaged in falsifying training records. They had the office door open and did not make any effort to conceal their actions from fellow employees. Dorshkind was one of several employees who observed this activity. Dorshkind mentioned immediately what she saw to two other employees.
Approximately six weeks later, Dorsh-kind telephoned her former supervisor, Marthe Jones, and brought up the incident. As Jones recalled, Dorshkind “was worried that the State would find out and that there would be repercussions for Oak Park, and she said she did not know what to do.” Dorshkind was “afraid” that Oak Park was “going to lose [its] license.” Dorshkind also told Jones that it appeared Hendricks and Niemer were having an affair. This was a “feeling” based on her observations and things she had heard. Jones agreed to contact the company’s human resources director, and Dorshkind went along with that plan. Dorshkind never contacted the DIA, nor did anyone relay her observations to the DIA.
The next day, September 4, 2008, the human resources director and another manager, also based in Madison, went to Dubuque to investigate the matter. After two days of interviewing and reviewing documents, they handed a termination letter to Dorshkind that alleged she had “not been truthful” in several respects, including the relationship between the two employees, the falsification of training records, and a matter related to Dorshkind’s own job duties.
Meanwhile, another witness to the July 24 events, Oak Park’s director of nursing Denise Schiltz, was so upset at what she saw that she turned in a thirty-day notice of resignation that day. When her term of employment officially ended, Schiltz contacted the DIA and filed an anonymous complaint of what she had seen.[8] This caused the DIA to launch another inspection. Following a site visit in late September 2008 brought on by Schiltz’s anonymous complaint, the DIA ultimately concluded that training documents had indeed been falsified. The DIA fined Oak Park $10,000 and issued a conditional certificate that temporarily prohibited Oak Park from admitting new residents.
III. Under Our Whistleblowing Precedents, the Employee Must Have Engaged in Protected Activity as Measured by a Statute or Regulation.
Let me now turn to our whistleblowing precedents. The first reporting or “whist-leblowing” case we decided was Tullís. See 584 N.W.2d 236. There we held an employee who had been terminated for seeking reimbursement of amounts wrongfully withheld from his paycheck had a cause of action for wrongful discharge. *313 See id. at 240. We found an explicit statutory underpinning for the employee’s claim. Iowa law provides, “ ‘An employer shall not discharge or in any other manner discriminate against any employee because the employee has filed a complaint....”’ Id. at 239 (quoting Iowa Code § 91A.10(5) (1995)). We specifically found that the employee’s internal letter to his employer amounted to a “complaint” under the statute. Id. at 239-40 (noting that regulations adopted under the statute provided that “ ‘[a] complaint to the employer made in good faith would be related to the Act, and an employee would be protected against discharge or discrimination caused by the complaint to the employer’ ” (quoting Iowa Admin. Code r. 347 — 36.6(2))). Accordingly, the employee’s firing violated a clear and express public policy. Id.
The key point in Tullís was that the employee’s internal demand to his employer for unpaid wages amounted to a protected complaint under the statute. “We are convinced, as was the district court, that Tullis’s formal letter to Merrill constituted a complaint related to unpaid wages for purposes of applying section 91A.10(5).” Id. at 240. Tullís was thus an internal reporting case where the statute protected internal reporting.
The same day we decided Tullís, we also decided Teachout v. Forest City Community School District, 584 N.W.2d 296 (Iowa 1998). Teachout should be viewed as an external reporting case where the law protected external reporting. In Teachout, a teacher’s assistant was terminated after reporting alleged child abuse both within her school and orally to the Department of Human Services (DHS), although the school was unaware she had already contacted DHS at the time of her termination. Id. at 298-99. We emphasized that Iowa law mandated reporting of suspected child abuse to DHS and provided immunity from civil or criminal liability for individuals making such reports. Id. at 300 (quoting Iowa Code §§ 232.73, .75 (1995)). We stated:
Although [the relevant statute] does not specifically mandate protection for an employee who in good faith makes a report of suspected child abuse, we think the forceful language of the statute articulates a well-recognized and defined public policy of Iowa from which such protection can be implied.
Id. at 300-01. Having found a “well-recognized and defined public policy,” we then concluded the school’s knowledge that Teachout intended to report child abuse to the authorities could support a wrongful-discharge claim. Id. at 301. As we explained:
It would be contrary to the public policy articulated in our child abuse laws to allow an employer to take adverse employment action on the basis of an employee’s intent to report child abuse. That is because the employer’s action would have the effect of discouraging the reporting of suspected abuse in direct opposition to the public policy of encouraging the reporting of child abuse. Consequently, if Teachout had a subjective good-faith belief that child abuse had occurred, she is protected from any retaliatory action by her employer causally related to her intent or threat to report the abuse.
Id. at 301.
However, we concluded that Teachout failed to establish a jury question on the element of causation. She had demonstrated only that her “termination occurred after the District learned she had engaged in a protected activity,” not that her conduct was a determinative factor. Id. at 302.
Teachout does not support the proposition that mere internal reporting of child *314 abuse would be a protected activity. To the contrary, even though there was no dispute the plaintiff had relayed her concerns internally, we implicitly acknowledged this would not amount to protected activity. We said that we “must” consider whether Teachout’s intent to report child abuse to DHS “could constitute protected activity so as to support a claim of retaliatory discharge.” Id. at 301. But of course, if Teachout had already engaged in protected activity when she told her principal about the child abuse, it would have been unnecessary for us to consider whether her intent to tell the authorities constituted protected activity.
In Harvey v. Care Initiatives, Inc., we rejected a wrongful-termination whistle-blowing claim brought by an independent contractor against a nursing home. 634 N.W.2d 681, 685-86 (Iowa 2001). The contractor there had “produced documents suggesting she was terminated for allegedly filing a complaint about the nursing home with the state’s Department of Inspection and Appeals.” Id. at 682. We observed that the relevant statutes allowed anyone to file a complaint, which would be kept confidential, but only protected employees and residents from retaliation or discrimination. Id. at 685-86. As we put it,
Our legislature has made it clear through section 135C.46 that the prohibition against retaliatory discharge only applies to residents and employees of the health care facility. If our legislature wished to extend the prohibition to all persons, it would have used the term “persons.”
Id. at 686. We also commented more generally that “[w]e find no compelling need, as we did for at-will employees, to support a wrongful-termination tort for independent contractors.” Id. at 684.
George, another whistleblowing case, involved a statute that protected external reports and an employee who lost his job for making such an external report. See 762 N.W.2d at 871-72. The employee there alleged he had been terminated for complaining to the division of labor services about his employer’s failure to take certain safety precautions during lead abatement jobs. Id. at 866-67. We found the employee had engaged in protected activity and had a common law cause of action because Iowa Code section 88.9(3) states “ ‘[a] person shall not discharge ... an employee because the employee has filed a complaint ... under ... this chapter.’ ” Id. at 871-72 (quoting Iowa Code § 88.9(3) (2007)).
In 2004, the United States Court of Appeals for the Eighth Circuit, applying Iowa law, held that an electrical utility employee who had been fired for openly disputing the safety of certain work procedures could pursue a public-policy wrongful-discharge claim against his employer. Kohrt v. MidAmerican Energy Co., 364 F.3d 894, 902 (8th Cir.2004). The court noted that the Iowa Occupational Safety and Health Act has a stated policy of “ ‘[ejncouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards at their places of employment, and to ... institute new and perfect existing programs for providing safe and healthful working conditions.’ ” Id. at 899 (quoting Iowa Code § 88.1 (2003)). It further emphasized that Iowa law makes it unlawful for an employer to “ ‘discharge or in any manner discriminate against an employee because the employee has filed a complaint....’” Id. at 899 (quoting Iowa Code § 88.9(3)).
Thus, although the Eighth Circuit found the issue “not free from doubt,” it concluded that “the public policy expressed in IOSHA would be undermined if [the utili *315 ty] were permitted to discharge an employee for voicing safety concerns.” Id. at 902. In a footnote, the court pointed out that the plaintiff had made a “protected complaint” because the regulations clarified that the definition of complaint includes “internal, good faith complaints made by an employee directly to an employer.” Id. at 902 n. 4. Kohrt was thus an internal whistleblowing case where the law expressly protected internal reporting.
By contrast, in Ballalatak, we refused to find a cause of action where no statute covered the internal reporting in question. That case involved an employee who was fired after “relaying concerns” that his employer was not fulfilling its workers’ compensation obligations to two fellow employees. Ballalatak, 781 N.W.2d at 278. We seemingly approved the Eighth Circuit’s Kohrt decision, and commented that “Kohrt and Jasper suggest internal whistle-blowing may be protected in certain circumstances.” Id. at 277. However, we found that Iowa’s workers’ compensation statutes do not “provide support for internal complaints based on a concern that the employer may not be complying with workers’ compensation laws.” Id. at 278. As this court put it, “The public policy found in Iowa’s workers’ compensation statutes strongly protects injured employees, but does not extend to coworkers or supervisors who express concerns regarding whether the injured employees will be properly compensated.” Id.
Just two years ago, we decided Berry, our most recent (until now) public-policy, wrongful-discharge case. This was not a whistleblowing case; rather, the case involved an injured employee who had been fired for bringing a personal injury lawsuit against an affiliate of his employer. See Berry, 803 N.W.2d at 108-09. We found that “chapter 668, Iowa’s comparative fault statute, does not contain a clearly defined and well-recognized public policy of this state that would limit an employer’s discretion to discharge an at-will employee.” Id. at 112. We emphasized that we look at statutes, our constitution, and administrative regulations as the sources of public policy. Id. at 110. A relevant statute must either “expressly protect[ ] a specific employment activity from retaliation by the employer” or “clearly imply ... the specific employment activity in question [is protected] from employer retaliation.” Id. at 111.
Berry’s emphasis on the term of the statute to define the scope of the tort was not new. In the absence of statutory authority, we had disallowed wrongful-discharge claims brought by employees who complained about wrongs against fellow workers. See, e.g., Ballalatak, 781 N.W.2d at 278. Likewise, we had denied an independent contractor’s wrongful-termination claim where the statute specifically protected only employees. See Harvey, 634 N.W.2d at 686. “The use of statutes maintains the narrow public-policy exception and ‘provide[s] the essential notice to employers and employees of conduct that ... can lead to tort liability.’ ” Ballalatak, 781 N.W.2d at 277 (quoting Jasper, 764 N.W.2d at 763).
Under our precedent until now, an employee who internally reported an observation of illegal workplace conduct, in the absence of some statute or regulation recognizing or protecting such reporting, had not engaged in protected activity for purposes of the wrongful-discharge tort. If mere internal reporting of illegality were sufficient, then Ballalatak should have had a wrongful-discharge claim. See id. at 278 (finding no protection for “internal complaints based on a concern that the employer may not be complying with workers’ compensation laws”). In Ballala-tak, we reiterated that “Iowa’s workers’ *316 compensation statutes provide a clear public-policy expression that employers are required to compensate employees for injuries arising out of and in the course of employment.” Id. Yet we said that Balla-latak’s “internal complaints” about his employer’s failure to comply with these duties did not amount to protected activity. Id. We acknowledged that, at least for purposes of summary judgment, Ballalatak’s “motives were to ensure compliance with the law and benefits for those under his supervision.” Id. However, “Ballalatak ha[d] not pointed to any Iowa law which clearly expresses protection for such actions,” i.e., his actions. Id.
All of this was consistent, as noted above, with our bedrock rule in Iowa that the employee must have engaged in the protected activity. See Berry, 803 N.W.2d at 110; Ballalatak, 781 N.W.2d at 275; Jasper, 764 N.W.2d at 761; George, 762 N.W.2d at 871; Lloyd, 686 N.W.2d at 228; Davis, 661 N.W.2d at 535; Fitzgerald, 613 N.W.2d at 282 n. 2.
IV. No Legislation or Regulation Recognized the Internal Reporting That Occurred in This Case; It Cannot Be Considered Protected Activity.
With the foregoing caselaw in mind, I return to this case. Chapter 231C provides, “Any person with concerns regarding the operations or service delivery of an assisted living program may file a complaint with the [DIA].” Iowa Code § 231C.7(1) (2007). It further states, “An assisted living program shall not discriminate or retaliate in any way against a tenant, tenant’s family, or an employee of the program who has initiated or participated in any proceeding authorized by this chapter.” Id. § 231C.13. Thus, an Iowa statute recognizes outside whistleblowing to the DIA. See id. § 231C.7(1). An Iowa statute also expressly protects individuals, such as Dorshkind’s coworker Schiltz, who report misconduct to the DIA. See id. § 231C.13.
Dorshkind, however, did not complain to the DIA. Nor is there evidence she intended to complain to the DIA, or threatened to go to the DIA, or wanted her internal complaints passed along to the DIA. To the contrary, she was worried the state would find out and there would be repercussions for Oak Park. Additionally, there is no evidence that any of Dorshkind’s actions even unwittingly led to the DIA investigation. In short, this not a case where an employee made, or intended to make, a statutorily recognized or protected complaint. Cf. George, 762 N.W.2d at 871-72; Teachout, 584 N.W.2d at 300-01; Tullis, 584 N.W.2d at 239-40.
The majority notes accurately that Iowa has a strong statutory policy of protecting residents of assisted living homes. The stated purposes of chapter 231C are:
a. To encourage the establishment and maintenance of a safe and homelike environment for individuals of all income levels who require assistance to live independently but who do not require health-related care on a continuous twenty-four-hour per day basis.
b. To establish standards for assisted living programs that allow flexibility in design which promotes a social model of service delivery by focusing on independence, individual needs and desires, and consumer-driven quality of service.
c. To encourage public participation in the development of assisted living programs for individuals of all income levels.
Iowa Code § 231C.1(2). And the trial record indicates that Oak Park violated the law by not providing required training, see Iowa Admin. Code r. 321 — 25.34(1)—(4), and by “attempting to obtain or retain a *317 certificate by fraudulent means, misrepresentation, or by submitting false information,” Iowa Code § 231C.10(l)(c).
But again, our precedents require a clearly defined and well-recognized public policy that protects the activity in question, i.e., internal reporting. Just because external reporting is the subject of a clearly defined and well-recognized statutory policy, it does not follow that internal reporting would be, at least when the employee’s actions did not result in and were not intended to result in an outside report.
It bears emphasis, as we pointed out in Berry, that a statute covering a particular activity does not have to directly bar employer retaliation in order to qualify as a clearly defined public policy. 803 N.W.2d at 111. “There need not be an express statutory mandate of protection....” Teachout, 584 N.W.2d at 300. It is sufficient if the statute explicitly recognizes the activity such that an employer’s retaliatory discharge for engaging in the activity would “conflict with” achievement of the legislative goal. Lara, 512 N.W.2d at 782. Hence, even if chapter 231C did not contain section 231C.13 prohibiting retaliation against whistleblowers to the DIA, section 231C.7(1) authorizing confidential reports to the DIA likely would be enough to sustain a wrongful termination claim if Dorshkind had been let go for reporting the records falsification to that agency.
Still, there must be enough in the statute to “clearly imply the statute protects the specific employment activity in question from employer retaliation.” Berry, 803 N.W.2d at 111 (emphasis added). Chapter 231C does not mention internal reports at all. Given the absence of a reference to internal communications, I cannot find chapter 231C “clearly implies” that persons making those kinds of reports are protected from retaliation.[9]
An additional consideration here is that the legislature made a specific decision in 2003 to facilitate the bringing of complaints before the DIA. See 2003 Iowa Acts ch. 166, §§ 14, 20 (codified at Iowa Code §§ 231C.7, .13 (Supp.2003)). It authorized the filing of these complaints, Iowa Code § 231C.7(1) (2007); it required the identity of persons bringing complaints to be kept confidential, id,.; it directed the DIA to establish a procedure for handling these complaints, id. § 231C.7(2); and it made it illegal for an employer to retaliate against anyone who initiated or participated in a proceeding before the DIA, id. § 231C.13. Given these express legislative determinations in 2003 to protect external reporting, but the complete absence of legislative references to internal reporting, I have grave difficulty concluding that the latter is protected by a clearly defined and well-recognized public policy embodied in legislation. We made this general point in Ballalatak, noting that the legislature’s decision to enact anti-retaliation statutes covering “other circumstances” could not support the employee’s argument that he had engaged in protected activity in that case. 781 N.W.2d at 278.
*318 The legislature’s decision to limit the scope of sections 231C.7 and 231C.13 to persons who report externally to the DIA is not an unreasonable choice. After all, as illustrated by this case, an internal report may never get to the DIA and may not result in corrective action. In any event, reasonable or not, it is the legislature’s choice, which under our precedents we are bound to follow.
V. Conclusion.
For the foregoing reasons, I respectfully dissent in part. In my view, the defendant s motion for directed verdict on liability should have been granted.
WATERMAN and ZAGER, JJ., join this concurrence in part and dissent in part.

. I concur in the result reached by the majority to the extent it affirms the court of appeals decision to set aside the punitive damage verdict. See Jasper v. H. Nizam, Inc., 764 N.W.2d 751, 773-74 (Iowa 2009) ("We have refused to permit punitive damages in an action for retaliatory discharge when the grounds for the discharge have been recognized for the first time in the instant case to be in violation of public policy.”); see also Lara v. Thomas, 512 N.W.2d 777, 782 (Iowa 1994).

. Like the majority, I present the facts in the light most favorable to Dorshkind, since she prevailed at trial.

. Although Schiltz acknowledged she could have filed an anonymous complaint with the DIA while she was still working for Oak Park, she waited until she was out of the facility. She did not believe anyone was in immediate jeopardy.

. Other states have taken a variety of approaches to public-policy-based wrongful-discharge claims. See Gerard Sinzdak, Comment, An Analysis of Current Whistleblower Laws: Defending a More Flexible Approach to Reporting Requirements, 96 Cal. L. Rev. 1633, 1643-44 (2008) (noting that around forty states recognize common law wrongful-discharge claims arising from a violation of public policy, that some apply that claim to whist-leblowing, and that "the requirements of a common law claim vary substantially from jurisdiction to jurisdiction ... includfing] whether the whistleblower must report externally or internally in order to receive protection”). As I have noted, Iowa has not taken a categorical approach that either extends to or does not extend to internal complaints. Instead, the focus has been on whether the employee's internal complaints were themselves covered by a clearly defined and well-recognized public policy.