Diane STREHLOW, Plaintiff,

v.

MARSHALLTOWN COMMUNITY SCHOOL DISTRICT; Aiddy Phomvisay, an individual; and Lisa Koester, an individual, Defendants.

No. 4:16–cv–109–RGE–HCA

United States District Court, S.D. Iowa, Central Division.

Signed 9/28/2017

Marc A. Humphrey, Humphrey Law Firm, P.C., Des Moines, IA, for Plaintiff.

Katie Lynn Graham, Debra Hulett, Nyemaster Goode PC, Des Moines, IA, for Defendants.

## ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Rebecca Goodgame Ebinger, United States District Judge

### I. INTRODUCTION

Now before the Court is a Motion for Summary Judgment filed by Defendants Marshalltown Community School District (the District), Aiddy Phomvisay, and Lisa Koester (collectively Defendants). ECF No. 34. The matter came before the Court for hearing on May 26, 2017. Hr'g Def.s' Mot. Summ. J. Mins., ECF No. 54. Attorney Marc Humphrey appeared on behalf of Diane Strehlow, the Plaintiff. *Id.* Attorneys Debra Hulett and Katie Graham appeared on behalf of Defendants. *Id.* Both parties argued in support of their respective positions. *Id.*; Pl.'s Br. Supp. Resist. Def.'s Mot. Summ. J., ECF No. 51–1; Defs.' Reply Supp. Summ. J., ECF No. 52. Following the hearing, Defendants submitted a supplemental brief responding to a recent decision by the Iowa Supreme Court. ECF No. 56.

Strehlow alleges she was constructively discharged in violation of public policy.[1] Defendants request the Court grant their

---

1. Strehlow has voluntarily withdrawn her claim for punitive damages. *See* Pl.'s Resist. Defs.' Mot. Summ. J. Req. Oral Argument ¶ 10, ECF No. 51.

motion for summary judgment because Strehlow has failed to produce a genuine issue of material fact showing Strehlow either engaged in protected conduct or was constructively discharged. Defendants also assert Strehlow has not introduced any evidence showing they intended for Strehlow to quit her position, or her engagement in allegedly protected conduct was causally connected to any constructive discharge. Defendants also argue Phomvisay and Koester cannot be held personally liable for Strehlow's constructive discharge because they did not direct or authorize her discharge, and the District is immune from liability under the Iowa Municipal Tort Claims Act. Defendants therefore claim they are entitled to judgment as a matter of law. Because Strehlow has failed to show she was constructively discharged or she engaged in protected activity, the Court grants Defendants' Motion for Summary Judgment. The Court therefore does not address Defendants' arguments regarding personal liability or the Iowa Municipal Tort Claims Act.

## II. FACTUAL BACKGROUND

The following facts are either uncontested or viewed in the light most favorable to Strehlow. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Munz v. Michael*, 28 F.3d 795, 796 (8th Cir. 1994) (holding when a federal court considers a motion for summary judgment under Federal Rule of Civil Procedure 56(c), it must view the facts alleged in the light most favorable to the non-moving party and must give the non-moving party all reasonable inferences from those facts).

In 2012, Marshalltown Community High School hired Strehlow to teach high school French and to serve as the National Honor Society advisor for the 2011–2012 school year. Defs.' Resp. Pl.'s Statement of Additional Material Facts ¶ 1, ECF No. 52–1. Phomvisay served as the principal at Mar-shalltown Community High School. Pl.'s Am. Compl. 1–2, ECF No. 14. Koester served as the Human Resources Coordinator at Marshalltown Community High School. *Id.* Strehlow was a contract teacher and was a member of the teachers' union. Pl.'s Resp. Defs.' Statement Undisputed Material Facts Supp. Mot. Summ. J. 8, ECF No. 51–2. Strehlow remained in the same position during both the 2011–2012 and 2012–2013 school years. ECF No. 14 at 2. In the spring of 2013, Phomvisay informed Strehlow her teaching position for the 2013–2014 school year would be changed to part time because of decreasing enrollment numbers for French. *Id.* ¶¶ 12, 14. Phomvisay explained in order to continue working full-time, Strehlow would have to begin teaching journalism as well. *Id.* ¶ 12. Additionally, during an employment review in May 2013, Deborah Holsapple, the associate principal at Marshalltown Community High School, informed Strehlow she would also have to take on the publication duties for the high school newspaper, *Pebbles*, and yearbook, *Postscript*. Pl.'s App. 353, ECF No. 51–10. Strehlow maintains Phomvisay's justification for the change in her schedule was not consistent with her examination of enrollment numbers for the previous two academic years. ECF No. 14 at 3. Although Strehlow expressed concern with Holsapple because she felt the enrollment numbers did not justify making the French position part time, she accepted the change in assignment for the upcoming calendar year. *Id.* at 3; ECF No. 51–2 ¶ 25.

During a class orientation for graduating eighth graders later that month, Strehlow and a fellow teacher noticed a significant decrease in the number of eighth graders expressing an interest in enrolling in foreign language classes. ECF No. 14 at 4. Strehlow asserts when she asked about the apparent decrease in French enroll-

ment, the students told her they were encouraged to sign up for Project Lead the Way, a science-focused program, rather than foreign languages during their freshman year. *See id.* Phomvisay was primarily responsible for implementing Project Lead the Way at Marshalltown Community High School and the 2013–2014 school year was the first year it was available to high school students. ECF No. 52–1 ¶ 14. Strehlow became concerned because she believed students were being misled regarding college requirements. ECF No. 14 at 4. This was based on her understanding that in order to gain admission to, and graduate from, a four-year college or university, students would have to complete four years of foreign language. *Id.* Later, in the spring of 2013, Phomvisay learned Strehlow was questioning students about their course preferences. Pl.'s App. 34, ECF No. 51–5. Phomvisay approached Strehlow and informed her it was inappropriate to ask students about their class choices. *Id.* at 34. Strehlow asserts she then questioned Phomvisay about why students were being diverted from foreign language courses to instead enroll in Project Lead the Way. ECF No. 14 at 5. In response, Strehlow alleges Phomvisay threatened to discipline her and stated he did not want to hear another word about the issue. *Id.*; ECF No. 51–5 at 34–36.

In the fall of 2013, Strehlow began teaching French and journalism, as well as managing the National Honor Society, *Pebbles*, and *Postscript. See* ECF No. 52–1 ¶ 20. On January 8, 2014, the Superintendent of the District sent an email requesting teachers complete a form listing their preferred teaching schedules and courses for the 2014–2015 school year. Defs.' App. 71, ECF No. 34–2. Strehlow submitted the form to Holsapple listing drivers' education, wood shop, German, pottery, and Project Lead the Way as her preferred courses. *Id.* at 67; ECF No. 14 at 5. Strehlow admits she knew she was not

qualified to teach those subjects and some of the courses were not available at Marshalltown Community High School. ECF No. 14 at 5. Strehlow asserts she submitted the request to Holsapple to "add some levity" to the situation. *Id.* On January 23, 2014, Holsapple issued Strehlow a formal discipline for insubordination based on the submitted form. ECF No. 34–2 at 72.

On March 13, 2014, Strehlow submitted a work request form to Holsapple regarding her classroom; it was marked "urgent." ECF No. 51–10 at 384. The request form stated, "[a]fter the flooding/burst pipe, a number of the floor tiles came up .... I've disposed of some pieces, but it looks like asbestos [is] exposed." *Id.* It is unclear whether Hosapple ever received this work request. *Compare* ECF No. 51–5 at 31 *with* Pl.'s App. 186–87, ECF No. 51–7 *and* ECF No. 51–5 at 86–87. On March 17, 2014, Strehlow sent an email to Eldon Stanley, the custodian at Marshalltown Community High School stating, "[Holsapple] got the work order last week for the tiles coming off the floor in 214 ... [A]fter checking on this[,] it seems that we've got asbestos that's exposed in a student work area. Knowing that I've been exposed to asbestos from handling the tiles is not a delight ...." ECF No. 34–2 at 78. Both Holsapple and Phomvisay were copied on the email. *Id.* On March 18, 2014, Holsapple responded in an email stating she was concerned Strehlow was "making this statement, especially when this information in not correct." *Id.* She explained she wanted "to have a discussion with [Strehlow], as when making a statement such as this will also start a panic among staff, students, parents, and [the] community, which is unnecessary." *Id.* Strehlow asserts following this email, Holsapple and Stanley told Strehlow there was no need to worry. *Id.* at 42. After this conversation, Strehlow did not follow up with Stanley,

Phomvisay, or Holsapple regarding her concerns. *Id.*

On April 25, 2014, Strehlow left a note for one of her students (Student A) at his place of employment. Pl.'s App. 209, ECF No. 51–8. The note stated, "Such a sad day it was, I had to ask why . . . At Legends, you—as destiny had it—were not my guy! Most sincerely yours, your friend and ardent reader, Mr. ——v ——y." *Id.*; *see also* ECF No. 51–5 at 51 (explaining the note as "an attempt to bring some levity and to uplift the student" following the student's complaints regarding Phomvisay's attitude toward him). The note had a heart drawn on it with "2014" written in the middle. *Id.* Following this, Student A texted a picture of the note to two of his classmates, who in turn alerted a teacher. ECF No. 51–6 at 144–45; ECF No. 51–8 at 223. On May 2, 2014, Strehlow was placed on administrative leave while the District investigated the letter. ECF No. 14 at 6; ECF No. 34–2 at 69. On May 8, 2014, the *Time Republican* newspaper published a story reporting Strehlow had been put on leave. Pl.'s App. 439, ECF No. 51–12. The article did not state the reasons for Strehlow's leave. *Id.*

On May 12, 2014, Koester informed Strehlow the District found she had violated its policy on harassment, as well as Chapter 25 of the Code of Professional Conduct and Ethics. ECF No. 34–2 at 69–70; ECF No. 14 at 2. Strehlow was placed on an unpaid leave of absence for the remainder of the calendar school year. ECF No. 34–2 at 70. The District also informed her it would make considerations "to terminate [her] extracurricular assignments of Yearbook, Newspaper, and National Honor Society due to just cause." *Id.* Strehlow signed the disciplinary letter on May 12, 2014. *Id.* On May 22, 2014, Strehlow emailed Koester and resigned from her extra-curricular activities for the 2014–2015 year. *Id.* at 66.

On June 10, 2014, Strehlow anonymously submitted a report to the Iowa Division of Labor Services, in which she stated, Marshalltown Community High School "[e]mployees are exposed to presumed asbestos containing material . . . The employer took no action to test, cover, conceal or remove the presumed asbestos." *Id.* at 80. The Iowa Division of Labor Services discovered asbestos in classroom 214. *Id.* Because the District contracted with a company to remove the material, the Iowa Division of Labor Services issued no citations. *Id.* at 83.

In early August of 2014, in an attempt to determine Strehlow's intentions for the 2014–2015 school year, Koester and Holsapple exchanged a number of emails with each other and Strehlow's union representative, Rick Moore. *Id.* at 61–63. On August 7, 2014, in response to a communication from Rick Moore and another union representative, Strehlow emailed Koester and resigned from her teaching position. *Id.* at 65. Strehlow stated she sent a letter to the District in mid–July resigning from her position; the District asserts it never received the letter and Strehlow has no evidence it was ever delivered. *Id.*; ECF No. 51–5 at 45.

On April 15, 2016, Strehlow filed this claim. Compl., ECF No. 1. Strehlow alleges she was constructively discharged in violation of public policy for raising concerns about students' course work and the presence of asbestos. ECF No. 1. ¶ 8–11. On June 22, 2016, Strehlow amended her complaint to remove the Marshalltown Community School Board as a defendant. ECF No. 14. On February 21, 2017, Defendants moved for summary judgment. ECF No. 34.

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), a federal court must grant a motion for summary judgment if there is no genu-

ine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[2] A dispute of material fact is "genuine" if " 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Finally, the moving party is entitled to judgment as a matter of law if the non-moving party fails to make a sufficient showing of an essential element of her claim, and on which the non-moving party has the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Reed v. ULS Corp.*, 178 F.3d 988, 989 (8th Cir. 1999).

When considering a motion for summary judgment, the court must view all facts in the light most favorable to the non-moving party and give the non-moving party all reasonable inferences from the facts presented. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Munz v. Michael*, 28 F.3d 795, 796 (8th Cir. 1994). The Court does not "weigh the evidence or attempt to determine the credibility of the witnesses," *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004), and instead must only "determine whether a dispute about a material fact is genuine," *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

## IV. DISCUSSION

The Court turns to Strehlow's claim she was constructively discharged in violation of public policy. After reviewing the record in the light most favorable to Strehlow, the Court makes the following findings. First, Strehlow has failed to produce any genuine issue of material fact showing a reasonable person in her position would have found her work environment so intolerable she had no choice but to quit. Consequently, Strehlow was not constructively discharged. Second, even if Strehlow could show she was constructively discharged, informing students about foreign language requirements and advocating for foreign language coursework is not a well-recognized public policy. Therefore, Strehlow did not engage in any protected conduct relating to the students' available coursework and cannot show she was constructively discharged in violation of public policy. Finally, even if Strehlow could show she was constructively discharged and engaged in protected conduct when she alerted the administration to possible asbestos in her classroom, the conduct was not causally or temporally related to her constructive discharge.

### A. Applicable Law

In her amended complaint, Strehlow alleges she was constructively discharged in violation of public policy. ECF No. 14 at 8–11. She argues she "raised concerns about conduct which was in direct violation" of two public policies in the state of Iowa: 1) "[t]he public policy of informing students of and providing a sufficient foreign language curriculum through all four (4) years of high school ... so as to prepare its students for the admission and graduation requirements ... at most colleges and universities," and 2) "[t]he recognition of the health risks associated from exposure to teachers and students to asbestos within

2. Because this case was filed in federal court based on diversity of citizenship, ECF No. 14 at 2, the substantive law of the forum state (Iowa) will govern the substantive issues of

this case. *See Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 388 (8th Cir. 2016).

the physical plant facilities at Marshalltown [Community] High School." *Id.* at 9. Defendants counter the Iowa Supreme Court has never recognized, and would not recognize, the tort of constructive discharge in violation of public policy. ECF No. 34 ¶ 3. Alternatively, Defendants argue Strehlow was not constructively discharged. Even if the Court were to find Strehlow was constructively discharged, Defendants contend speaking with students about foreign language requirements is not a recognized public policy, and Strehlow never engaged in any protected conduct. *Id.* ¶¶ 4, 8, 11, 12.

Strehlow relies primarily on *Balmer v. Hawkeye Steel* for the proposition that Iowa recognizes the tort of constructive discharge in violation of public policy. *See* ECF No. 51–1 at 11. In *Balmer*, the Iowa Supreme Court affirmed a directed verdict against an employee who claimed constructive discharge. *Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 640, 643 (Iowa 2000). While the *Balmer* court declined to recognize the tort of constructive discharge standing alone, the court noted in dicta, "a constructive discharge is actionable only when an express discharge would be actionable in the same circumstances," such as with "an accompanying claim that the discharge was the result of illegal conduct such as the violation of public policy." *Id.* at 639, 643. Strehlow argues this language, coupled with additional Iowa case law, "overwhelmingly supports the premise that constructive discharge in violation of public policy is an available tort in Iowa." ECF No. 51–1 at 14.

Although the Iowa Supreme Court has recognized both constructive discharge and wrongful termination in violation of public policy as separate torts, notwithstanding the dicta in *Balmer*, the Iowa Supreme Court has never recognized a successful claim of constructive discharge in violation of common-law public policy. Rather, the Iowa Supreme Court has only recognized constructive discharge in the context of statutory violations. *See e.g., Van Meter Indus. v. Mason City Human Rights Comm'n*, 675 N.W.2d 503, 505 (Iowa 2004) (claiming constructive discharge and sex discrimination in violation of the Iowa Civil Rights Act); *Sievers v. Iowa Mut. Ins.*, 581 N.W.2d 633, 635 (Iowa 1998) (claiming constructive discharge and a violation of the Iowa Civil Rights statute prohibiting age discrimination); *Haberer v. Woodbury Cty.*, 560 N.W.2d 571, 575–76 (Iowa 1997) (claiming constructive discharge in violation of the Iowa Code chapter 341A); *First Judicial Dist. Dep't of Corr. Servs. v. Iowa Civil Rights Comm'n*, 315 N.W.2d 83, 85 (Iowa 1982) (claiming constructive discharge in violation of state anti-discrimination regulations). The Iowa Supreme Court in *Reihmann v. Foerstner* considered a claim of constructive discharge in violation of public policy. 375 N.W.2d 677, 683–84 (Iowa 1985). However, the *Reihmann* Court did not rule on whether the plaintiff could sustain a claim of constructive discharge without a statutory violation, and instead dismissed the case because the plaintiff failed to show he had been constructively discharged. *Id.* at 683–84; *see also Abbott v. RJS Elecs.*, No. 05-1959, 2006 WL 2872632, at *5 (Iowa Ct. App. Oct. 11, 2006) (dismissing a constructive discharge claim without reaching the issue of public policy because the plaintiff alleged constructive discharge based on battery). While Defendants conceded during the hearing the Iowa Supreme Court may, in the future, recognize this tort, for the purposes of this case, the Court need not decide this issue nor anticipate the Iowa Supreme Court's rulings. Rather, the Court holds even if the Iowa Supreme Court were to recognize the tort of constructive discharge in violation of public policy, Strehlow has not raised a genuine issue of material fact regarding the ele-

ments of either constructive discharge or wrongful termination in violation of public policy, the constituent parts of any constructive discharge in violation of public policy claim.

■ Because the Iowa Supreme Court has never recognized the tort of constructive discharge in violation of public policy, the Court will analyze the elements of each component tort separately: constructive discharge and wrongful discharge in violation of public policy. The Iowa Supreme Court has recognized "[c]onstructive discharge, like any other discharge, is an adverse employment action that will support an action for unlawful retaliation." *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 591 (Iowa 2017) (alteration in original) (quoting *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 497 (8th Cir. 1995)). To successfully assert a claim of constructive discharge, an employee must show the employer "deliberately ma[de the] employee's working conditions so intolerable that the employee [was] forced into an involuntary resignation." *Id.* (quoting *Van Meter*, 675 N.W.2d at 511). The test for constructive discharge is objective: the issue "is not how plaintiff felt but whether a reasonable person in his position would have" been compelled to quit. *Reihmann*, 375 N.W.2d at 683. Furthermore, "[t]he conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Haskenhoff*, 897 N.W.2d at 592 (quoting *Haberer*, 560 N.W.2d at 575–76). Consequently, "[c]ourts have consistently required 'something more' for constructive discharge claims than for ordinary discrimination or retaliation." *Id.* at 597 (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004)). Although an employer need not explicitly intend for the employee

to quit because of the intolerable conditions, it is sufficient if the employee's resignation was a "reasonably foreseeable" consequence of the employer's actions. *Id.* at 592. Finally, a divided Iowa Supreme Court has suggested a plaintiff is not required to give her employer a reasonable opportunity to respond to her complaints before she resigns in certain situations. *See Haskenhoff*, 897 N.W.2d at 604 (Cady, J.) (explaining "[c]onstructive discharge is a concept of reasonableness" and while in certain situations "it would not be reasonable for an employee to quit without giving the employer a chance to resolve the problem," in others "it would not be reasonable to require an employee to remain in intolerable working conditions"). Because the Court ultimately concludes Strehlow was not constructively discharged, it need not decide whether an opportunity to respond would be required under these facts. The Court now turns to the elements of wrongful discharge in violation of public policy.

■ The tort of wrongful discharge in violation of public policy is a narrow exception to Iowa's employment-at-will doctrine. *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 559–60 (Iowa 1988) (establishing the exception). In order to establish a wrongful discharge claim, an employee must show: 1) she engaged in protected activity, 2) she suffered an adverse employment action, and 3) there was a causal connection between the employment action and the protected activity. *Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 299 (Iowa 1998). While an employee's activity is not required to fall within an "express mandate of [statutory] protection" to satisfy the first prong, "the employee's activity must advance a well-recognized and defined public policy of the state" to receive protection. *Id.* at 300. Because the public policy must be well-recognized and well-defined, courts "must proceed cautiously

when asked to declare public policy to support an exception to the at-will doctrine." *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 283 (Iowa 2000). Consequently, the Iowa Supreme Court has rejected "[a]ny effort to evaluate the public policy exception with generalized concepts of fairness and justice." *Id.* Instead the Iowa Supreme Court has focused on whether the policy is so well established an employer would be on notice the policy protects employees from wrongful termination. *Jasper v. H. Nizam*, 764 N.W.2d 751, 763 (Iowa 2009) (explaining the policy should be understood as a "benchmark" of society).

With these limitations in mind, the Iowa Supreme Court has identified three possible sources of well-established public policy: 1) state statutes, 2) the Iowa Constitution, and 3) administrative rules. *See Jasper*, 764 N.W.2d at 764 ("[A]dministrative regulations can be used as a source of public policy to support the tort of wrongful discharge when adopted pursuant to a delegation of authority in a statute that seeks to further a public policy."); *Fitzgerald*, 613 N.W.2d at 283 (noting the court has "also indicated our Constitution to be an additional source"); *Lara v. Thomas*, 512 N.W.2d 777, 782 (Iowa 1994) (finding a public policy protecting individuals filing workers' compensation claims based on an Iowa statute creating the benefits). The Iowa Supreme Court has expressed a preference for statute-based public policy and noted administrative rules are sufficient bases only because they further "a specific legislative expression of [ ] policy." *Jasper*, 764 N.W.2d at 764; *id.* at 765 (recognizing a public policy for having a particular ratio of children-to-staff in daycares based on an administrative regulation requiring the ratio); *see also Fitzgerald*, 613 N.W.2d at 283 ("In determining whether a clear, well-recognized public policy exists for purposes of a cause of action, we have primarily looked to our statutes ....").

 Along with establishing a clear public policy, a successful plaintiff pursuing a claim for wrongful discharge in violation of public policy must also show she engaged in protected activity advancing the policy and her discharge was causally connected to her protected activity. *Teachout*, 584 N.W.2d at 299. The Iowa Supreme Court has identified four categories of statutorily-protected activities: 1) "exercising a statutory right or privilege" such as filing a workers' compensation claim; 2) "refusing to commit an unlawful act" such as refusing to commit perjury; 3) "performing a statutory obligation," including testifying truthfully; and 4) reporting a statutory violation. *Jasper*, 764 N.W.2d at 762. Furthermore, whistleblowing—one of the activities Strehlow asserts she engaged in—is only an exception "if the public policy ... requires protection of the public by ensuring 'infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare' are properly reported." *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 303–04 (Iowa 2013) (quoting *Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685, 689 (1988)). Finally, the Iowa Supreme Court has noted an employee is not required to actually engage in protected conduct, such as filing for workers' compensation; instead, it "view[s] the good faith intent to engage in a protected activity the same as performing the protected activity." *Fitzgerald*, 613 N.W.2d at 278 (holding an employee engaged in protected conduct when he stated his intent to testify truthfully).

 Another element of a successful claim of wrongful discharge in violation of public policy is causation. Specifically, "[t]he employee's engagement in protected conduct must be the *determinative* factor in the employer's decision to take adverse

action against the employee." *Teachout*, 584 N.W.2d at 301 (emphasis in original). "A factor is determinative if it is the reason that 'tips the scales decisively one way or the other,' even if it is not the predominant reason behind the employer's decision." *Id.* (quoting *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 686 (Iowa 1990)). Consequently, "more than a temporal connection between the protected conduct and the adverse employment action is required" to create a factual issue of causation. *Boyle v. Alum–Line, Inc.*, 710 N.W.2d 741, 750–51 (Iowa 2006). Although "[t]he causation standard in a common-law retaliatory discharge case is high," *Teachout*, 584 N.W.2d at 301, an employee does not need to prove the employer lacked an "overriding business justification" for the discharge, *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 899 (Iowa 2015). However, the employer's business justification is a relevant consideration, as "an employer will prevail if it convinces the fact finder that the legitimate business reasons supporting the [discharge] were so strong as to defeat the conclusion that the protected conduct was the determining factor." *Id.* at 899. Therefore, just because an employee has engaged in protected conduct "does not immunize [her] from discharge for past or present inadequacies, unsatisfactory performance, or insubordination." *Hulme v. Barrett*, 480 N.W.2d 40, 42 (Iowa 1992).

### B. Strehlow Was Not Constructively Discharged

Strehlow argues after she engaged in protected conduct by "advocating" for students with regard to foreign language credits and college enrollment, and alerting the administration to asbestos, she was subject to intolerable working conditions and her only recourse was to quit. ECF No. 51–5 at 19, 26. Although Strehlow does not claim her change in assignment in May 2013 was the result of any protected activity, Strehlow asserts after she spoke with

Phomvisay about the Project Lead the Way program in May 2013, her working conditions began to deteriorate. ECF No. 34–2 at 38, 46. Specifically, at the hearing on Defendants' Motion to Dismiss, Strehlow explained following her conversation with Phomvisay, she was disciplined in January 2014 for insubordination, was subject to unpaid administrative leave for leaving Student A the note, and was not given fair consideration by Koester during the investigation. ECF No. 51–1 at 9 (explaining Strehlow contends the harassment claim was not fully investigated because her "standing" had fallen after she complained to Phomvisay and reported the asbestos). Finally, Strehlow claims her removal from class following the discovery of the note and the newspaper article reporting on her administrative leave contributed to the hostile environment and, therefore, her constructive discharge. ECF No. 34–2 at 39 ("When you're taken out of your classroom like that and then brought into the office that way, your name is in the paper, your case isn't fully investigated either, yes, it feels hostile.").

Defendants argue Strehlow has failed to produce a genuine issue of material fact that she was constructively discharged. ECF No. 34 ¶ 4. Defendants assert Strehlow cannot show a reasonable person would find her working conditions so intolerable the only recourse was resignation. ECF No. 38 at 5–9. Instead, they argue Strehlow voluntarily made the choice to return to Wisconsin after she left a "love note" for one of her students. *Id.* at 9–10.

Strehlow has not produced a genuine issue of material fact as to whether she was constructively discharged. Strehlow alleges a number of instances created a work environment so hostile her only recourse was to quit: 1) the January 2014 discipline for insubordination; 2) the alleg-

edly biased investigation into Student A's note; 3) the unpaid administrative leave in May 2014; 4) the newspaper article reporting her administrative leave; and 5) Holsapple's stern response when Strehlow reported what she believed to be asbestos. Applying an objective standard, even when the record is viewed in the light most favorable to Strehlow, no reasonable person in Strehlow's position would have felt compelled to resign. First, the discipline for insubordination was given eight months after she allegedly engaged in protected conduct by speaking with Phomvisay about Project Lead the Way. ECF No. 34–2 at 72. Beyond her heavy schedule, which was set before she engaged in any alleged protected activity, Strehlow has failed to point to any specific instances of hostility on the part of Defendants during the eight-month period leading to her alleged constructive discharge in the summer of 2014.

As for the investigation into the note Strehlow left for Student A and her subsequent administrative leave, Strehlow has conceded the "administration did what [it] needed to do" and she felt "it was appropriate that they felt that at that time." ECF 51–5 at 58; *see also id.* at 63–64. She has also conceded the note was an inappropriate communication to have with a student and admitted she exercised poor judgment in sending it. *Id.* at 51; ECF No. 51–8 at 214 (noting in a letter to the administration following her resignation she "acknowledge[s] that this note was unartfully done, and that [she] exercised bad judgment"). Furthermore, the evidence shows even though Strehlow was aware she could have been terminated for her behavior concerning Student A, she was instead placed on unpaid leave for the remainder of the semester, a period of only a few weeks. ECF No. 51–5 at 60; ECF No. 34–2 at 69–70. Therefore, even if Koester did not fully investigate Student A's harassment claim, as Strehlow contends, the administration still chose not to terminate Strehlow and instead placed her on a short, unpaid leave.

As for the news article concerning Strehlow's administrative leave, the article only notes she was placed on leave and does not explain the circumstances surrounding the decision. ECF No. 51–12 at 439. In the article, the District's communications manager explained the leave was not related to a criminal complaint, while Phomvisay stated he would not discuss personnel matters. *Id.*

Finally, in response to Strehlow's March 17, 2014 email reporting what she believed to be asbestos in her classroom, Holsapple explained she was concerned Strehlow was making incorrect statements regarding asbestos to members of the public. ECF 34–2 at 78. Although Strehlow asserts she did not tell any students or parents about her suspicions, she agrees it would have been inappropriate for a teacher to raise concerns about asbestos to individuals outside the administration. ECF No. 51–5 at 31. Furthermore, Strehlow was not formally disciplined for the issues Holsapple raised in her March 18, 2014 email to Strehlow; rather, they only had an in-person meeting together. *Id.* at 29.

No reasonable person in Strehlow's position would find Defendants' actions created an environment so intolerable the only recourse was resignation. Defendants' actions do not demonstrate the "something more" required to find constructive discharge; merely trivial or isolated actions do not suffice. *Haskenhoff*, 897 N.W.2d at 591, 597. The Iowa Supreme Court and the Iowa Court of Appeals have not recognized constructive discharge in cases with similar or objectively more intolerable fact patterns. *See, e.g., Haberer*, 560 N.W.2d at 573–74, 577 (finding no constructive discharge when the plaintiff was placed on 18 months of paid administrative leave and a 30-day unpaid suspension while criminal

charges were being investigated against him); *Reihmann*, 375 N.W.2d at 683–84 (holding no constructive discharge occurred when an employee was transferred to another bank branch when his relationship with his co-workers began to deteriorate, even though plaintiff alleged the claims against him were false); *Wright v. Ross Holdings, LLC*, No. 14-1106, 2015 WL 1848534, at *4 (Iowa Ct. App. Apr. 22, 2015) (holding an employee's work environment was not sufficiently severe or pervasive to constitute constructive discharge when, in reference to her co-workers' belief others were too preoccupied with looking at plaintiff's chest to notice her eye color, her coworkers called her "blue eyes" for multiple years). When interpreting Iowa law, the United States District Court for the Northern District of Iowa has not found constructive discharge after an African–American employee's supervisor sent him a picture depicting beer cans wearing white hoods and another with a noose around the middle. *Martin v. Champion Ford, Inc.*, 41 F.Supp.3d 747, 753, 762 (N.D. Iowa 2014). In contrast to these cases, the *Van Meter* Court found a female employee was constructively discharged when a promotion was given to a less qualified male employee, her employer provided a delayed response to her concerns, and her supervisor informed her he would make the same decision again if given the chance. *Van Meter*, 675 N.W.2d at 508, 512 (noting based on her supervisor's response, it was reasonable for plaintiff to conclude she would never be promoted because of her gender).

Strehlow has alleged she was informally scolded via email for reporting her belief there was asbestos in her classroom, disciplined eight months after allegedly engaging in protected conduct, and received a short unpaid leave following an investigation she herself concedes was necessary and which could have led to her termination. As the Iowa Supreme Court has noted, "[e]very job has its frustrations, challenges, and disappointments" and an employee cannot "be unreasonably sensitive" to her working conditions. *Haberer*, 560 N.W.2d at 576 (quoting *Turner v. Anheuser–Busch, Inc.*, 7 Cal.4th 1238, 32 Cal. Rptr.2d 223, 876 P.2d 1022, 1026 (1994)). While Strehlow may have been frustrated or found her working conditions subjectively intolerable, she has failed to point to factual instances that, as a whole, would lead a reasonable person to quit rather than continue teaching. To the extent Strehlow alleges she was required to perform a difficult schedule, Strehlow has repeatedly conceded the change in her teaching assignments was not related to any protected conduct. ECF No. 34–2 at 38. Therefore, even if Strehlow was subject to an unreasonable schedule, a finding the Court does not make, the schedule was not related to any protected conduct and therefore cannot form the basis of her constructive discharge claim. The Court thus finds Strehlow was not constructively discharged from her position at Marshalltown Community High School in August 2014.

Because Strehlow has failed to show she was constructively discharged, Defendants are entitled to summary judgment as a matter of law. *Reed*, 178 F.3d at 989.

**C. Encouraging Students to Take Foreign Language Courses is Not a Clearly Established Public Policy**

In addition to concluding Strehlow was not subject to intolerable working conditions and therefore not constructively discharged, the Court also finds Strehlow's actions regarding foreign language requirements do not support a clearly established public policy. This finding also warrants granting Defendants' Motion for Summary Judgment.

Strehlow argues speaking with Phomvisay in May of 2013 and raising her concerns about students being diverted from foreign languages to Project Lead the Way was protected activity in support of an established public policy. Specifically, Strehlow asserts she was supporting "[t]he public policy of informing students of and providing a sufficient foreign language curriculum through all four (4) years of high school ... so as to prepare its students for admission and graduation requirements" at most colleges and universities. ECF No. 14 at 2. In response to this protected conduct, Strehlow asserts she was subjected to a hostile work environment and allegedly constructively discharged in violation of public policy. In her brief resisting Defendants' Motion for Summary Judgment, Strehlow points to numerous sources to support her assertion of public policy. First, she cites to the "education clause" of the Iowa Constitution, which directed the general assembly to use land proceeds to support schools, established the Board of Education, and temporarily limited the legislature's power to enact educational policy. ECF No. 51–1 at 17–18 (citing Iowa Const. art. IX, div. 2, § 3 (1857); div. 1, §§ 1, 15). Second, Strehlow points to the Iowa Supreme Court's decision in *King v. State of Iowa*, which, Strehlow asserts, confirmed educational policy can be discerned from both the Board of Education, as well as the legislature. *Id.* at 16–17 (citing *King v. State*, 818 N.W.2d 1 (Iowa 2012)). Next, she directs the Court to Iowa Code section 256.37, which states, in pertinent part, "[i]t is the policy of the State of Iowa to provide an education system that prepares the children of this state to meet and exceed the technological, informational, and communication demands of our society." *Id.* at 18–19 (citing Iowa Code § 256.37 (2017)). Fourth, Strehlow cites the mission statement of the Iowa State Board of Education, which notes "[i]ndividuals will pursue postsecondary education

in order to drive economic success." *Id.* at 19–20 (citing Pl.'s App. 432, ECF No. 51–11). Finally, Strehlow points to the Board of Education's 2012 strategic plan, which lists "[i]ncreas[ing] the percentage of students who have obtained an associate of arts degree who transfer into a four-year institution" as a measurement of its education goals. *Id.* at 20 (citing ECF No. 51–11 at 430).

Defendants counter there is no public policy in Iowa for speaking to eighth graders or school administration about reducing the number of French sections taught in high school. ECF No. 38 at 15–16. Additionally, they argue rather than engaging in protected activity, Strehlow's conversation with Phomvisay about the requirements was "nothing more than a disagreement over the importance of humanities over STEM." ECF No. 52 at 1.

Even if Strehlow could show she was constructively discharged following her complaint to Phomvisay in May 2013, which the Court has held she cannot, the Court finds advocating for higher education or advocating for foreign language over the Project Lead the Way program is not a clearly established public policy. Consequently, Strehlow did not engage in any protected conduct when she spoke with Phomvisay regarding her teaching assignments.

In Iowa, the public policy exception to the at-will employment doctrine is extremely narrow. *Jasper*, 764 N.W.2d at 762 (explaining the court primarily looks at the legislature as a source of public policy because statutes are appropriately narrow). The Iowa Supreme Court thus demands a court use extreme caution before establishing a public policy under this exception. *Fitzgerald*, 613 N.W.2d at 283. Past cases have therefore primarily focused on whether the policy is so well established an employer would be on no-

tice the policy protects employees from wrongful termination. *Jasper*, 764 N.W.2d at 763. Iowa cases illustrate this restrained approach. In *Lloyd v. Drake University*, the Iowa Supreme Court found too broad a public policy exception for wrongful discharge based on a private security guard's detainment of a student on suspicion of criminal activity. 686 N.W.2d 225, 230 (Iowa 2004). The Iowa Supreme Court rejected the plaintiff's claim he was supporting the public policy of investigating and stopping crime, noting although it approved of the sentiment "the criminal laws of the state reflect a general public policy against crime and in favor of the protection of the public ..., the public policy asserted here is far too generalized [and] is not *clearly defined*." *Id.* (emphasis in original). The Iowa Supreme Court also favorably quoted the Oregon Supreme Court, which held in a similar case, "[the statutes] are neutral on the essential issues, which is whether the law encourages law enforcement action by private individuals or security personnel or otherwise demonstrates that such acts enjoy high social value." *Id.* at 230–31 (quoting *Babick v. Or. Arena Corp.*, 333 Or. 401, 40 P.3d 1059, 1063 (Or. 2002)). The stated public policy was therefore both too broad and not specific to the plaintiff's particular conduct. *Id.*

Like the broad assertions in *Lloyd*, Strehlow looks to general principals in support of her public policy claims, rather than specifics. Strehlow points to the education clause of the Iowa Constitution, the decision in *King*, Iowa Code section 256.37, and the goals and strategies of the Iowa State Board of Education. ECF No. 51–1 at 16–24. She asserts these sources illustrate a clearly established public policy of providing students with sufficient foreign language curriculum through all four years of high school so as to prepare them for admission and graduation from college. ECF No. 14 at 6. This is simply too broad.

First, a public policy of preparing high school students to attend and graduate from college is, much like a public policy of stopping crime, a socially desirable goal. It is not, however, "clearly defined." *See Lloyd*, 686 N.W.2d at 230. Specifically, because it is unclear what activities "preparing students for college" might entail (or exclude), under this public policy no employer would be on notice as to whether their actions constituted an exception to the at-will doctrine. As the Iowa Supreme Court in *Jasper* noted, the court prefers statutes as a basis for the public policy exception because they help "provide the essential notice to employers" regarding their conduct. *Jasper*, 764 N.W.2d at 763. Notice would be impossible under the broad articulation of public policy Strehlow advocates. Furthermore, Strehlow cannot point to any particular statute, administrative rule, constitutional article, or published case which speaks to the unique issue of foreign language in high school. *See Lloyd*, 686 N.W.2d at 230–31 (quoting from *Babick*, in which the Oregon Supreme Court declined to find a public policy exception because the statutes relied upon did not speak to the particular issue present in the case: law enforcement by private individuals or security guards).

In addition to the problems of notice and specificity, Strehlow's reliance on the *King* decision, as well as Iowa Code section 256.37, are unconvincing. Although the Iowa Supreme Court in *King* confirmed both the legislature and Board of Education could control educational policy, the *King* Court also specifically discussed section 256.37 as it relates to private rights of action. *King*, 818 N.W.2d at 15. Iowa Code section 256.37 explains,

[i]t is the policy of the State of Iowa to provide an education system that prepares the children of this state to meet and exceed the technological, informational, and communications demands of

our society ... Every adult Iowan must be literate and possess the knowledge and skills necessary to compete in a global economy and exercise the rights and responsibilities of citizenship.

Iowa Code § 256.37 (2017).

In *King*, the Iowa Supreme Court determined because this statute only stated "goals," rather than educational requirements, "[p]ermitting a private right of action under [this section] would likely unleash a multiplicity of future lawsuits that would transform aspirational goals into a series of specific mandates." *King*, 818 N.W.2d at 35. Rather than illustrating a clearly-defined public policy, *King* instead demonstrates the Iowa Supreme Court's unwillingness to proscribe liability based on general aspirations, rather than particular regulations or statutes. As the *King* Court noted, "[w]hile [we] acknowledg[e] the undeniable importance of education, our court has previously characterized it as an area where there is no true consensus and where needs change over time. Thus, we have said that 'education is defined as a broad and comprehensive term with a variable and indefinite meaning.'" *Id.* at 29 (quoting *In re Petty*, 241 Iowa 506, 41 N.W.2d 672, 675 (Iowa 1950)). Therefore, although the *King* decision may have articulated a general, state-wide desire for education, the Iowa Supreme Court declined to allow such a goal to form the basis of tort liability. Additionally, Strehlow has not pointed to anything suggesting the public policy exception in Iowa can be triggered by court decisions, rather than legislative enactments.

Finally, the Iowa Board of Education's goals and strategies regarding education do not support Strehlow's claims. Although the Board does include the goal of having individuals pursue post-secondary education, and lists increases in graduation rates as a measurement of success, Strehlow's reasoning again sweeps too broadly.

*See* ECF No. 51–1 at 19 (citing ECF No. 51–11 at 432). Even if increasing the number of students attending colleges and universities were a general public policy, there is nothing indicating *how* the State of Iowa would prefer school districts achieve this goal. While Strehlow's advocacy of foreign language may advance any such broad public policy, the same is true for encouraging students to enroll in the Project Lead the Way program. If anything, the State of Iowa has established a preference for STEM–based programs as a tool for achieving academic and economic success among its students. *See, e.g.*, Defs.' Supp. App. 1–3, EFC No. 52–2 (announcing two out of four of the new STEM programs chosen by the Iowa Governor's STEM Advisory Council are offered by Project Lead the Way); *id.* at 11–12 (quoting Governor Terry Branstad as saying, "Every one of the STEM programs rolled out to educators across Iowa this past year has met or exceeded its objective of inspiring greater interest in STEM among students"); Iowa Code § 256.37 ("Iowa students must be first in the world in science and mathematics achievement."). Although Strehlow may prefer to achieve the goal of higher education through encouraging students to take foreign languages, she has pointed to no statute, constitutional provision, or administrative rule suggesting advocacy of foreign languages is a protected activity. As the Iowa Supreme Court in *Jasper* noted, "the policy identified must deal with a public interest so that the discharge from employment violates a fundamental, well-recognized interest that serves to protect the public, not individual interests." *Jasper*, 764 N.W.2d at 765.

Because Strehlow has failed to show she engaged in protected conduct advancing any well-recognized public policy, even assuming she was constructively discharged, Defendants are entitled to summary judg-

ment as a matter of law. *Reed*, 178 F.3d at 989.

## D. Strehlow's Resignation Was Not Causally Related to Reporting Asbestos

■ Finally, the Court will consider Strehlow's constructive discharge claim as it relates to her complaint of asbestos in March 2014. Strehlow argues her alleged constructive discharge in the summer of 2014 was in retaliation for reporting the presence of asbestos to the administration in March 2014. Specifically, Strehlow asserts after she complained of asbestos in her classroom, her "standing" in the administration changed and Defendants began to look for reasons to be critical of her. ECF No. 51–1 at 9, 27. Strehlow argues the investigation into the letter she left for Student A was an example of this criticism—because her standing had diminished, Koester either did not conduct a fair and thorough inquiry or, alternatively, overreacted to the Student's claim. *Id.* at 9–10 (arguing Strehlow was "looked at differently" following her report and the administration could have simply mediated a conversation between Strehlow and Student A, rather than putting her on administrative leave). Finally, Strehlow notes "[h]er working condition further deteriorated" after she reported the asbestos. *Id.* at 10. Defendants respond Strehlow has failed to produce any genuine issue of material fact her alleged constructive discharge and administrative leave "was anything other than related to the [n]ote" she left Student A." ECF No. 52 at 4–5.

In order to prove wrongful discharge in violation of public policy, an employee must show the employee's protected conduct was the "determinative" factor in the

employer's decision to terminate the employee. *Teachout*, 584 N.W.2d at 301. If the Court assumes: 1) Strehlow was constructively discharged; 2) there is a well-recognized public policy of reporting possible asbestos in schools; and 3) Strehlow engaged in protected conduct when she sent one email in March 2014 and had one meeting with Holsapple, the claim of constructive discharge for violation of public policy nonetheless fails.[3] The protected conduct must be causally related to the discharge, and no reasonable jury could find Strehlow's alleged protected conduct was causally related to her choice to resign.

Apart from the fact Strehlow was placed on administrative leave approximately two weeks after alerting the administration to possible asbestos in her classroom, Strehlow cannot point to any specific facts in the record to show her administrative leave, and subsequent resignation, was related to her asbestos complaint. *See Boyle*, 710 N.W.2d at 750–51 (explaining a mere temporal connection between alleged protected conduct and discharge is not sufficient, by itself, to establish this "high" standard of causation). Instead, Strehlow asserts she ultimately felt she needed to leave because of a combination of factors related to the harassment investigation: 1) the allegedly biased nature of the investigation; 2) the shame she felt after she was scolded in front of students and parents following her removal from her classroom on May 2, 2014; 3) the "rumor mill" regarding her administrative leave; and 4) her suspicion the administration was setting her up for embarrassment. *See* ECF No. 51–5 at 64. Although this may have been how Strehlow subjectively perceived these events, she has failed to provide any evidence or

---

**3.** Because the Court finds Strehlow cannot show the first element of her claim—she was constructively discharged—the Court need not, and does not, make any findings regarding the validity of Strehlow's public policy claims as they relate to her reports of asbestos.

facts to illustrate how the investigation into the note was related to, or encouraged by, her asbestos complaint. Instead, Strehlow admitted the administration was within its right to investigate the note and concedes harassment claims should be investigated when they are raised. *Id.* at 58, 63. Furthermore, although Strehlow contends Koester either failed to fully investigate the situation or, alternatively, overreacted to the complaint, *id.* at 64; ECF No. 51–1 at 27, Strehlow has not provided any evidence showing Koester even knew Strehlow had complained of asbestos when she investigated the Student's complaint, *see* ECF No. 34–2 at 78 (showing the original email Strehlow submitted reporting asbestos was sent to Stanley, Holsapple, and Phomvisay); *id.* at 42.

Finally, even if Strehlow could illustrate some causal connection between her allegedly protected activity and her resignation, as the Court has stated above, no reasonable person would find Strehlow's working conditions objectively intolerable. *See* Section IV.B. Therefore, Defendants are entitled to summary judgment as a matter of law.

## IV. CONCLUSION

The Court grants Defendants' Motion for Summary Judgment. Strehlow was not constructively discharged.

**IT IS SO ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 34, is **GRANTED.**